RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MICKY RIFE,

*Defendant-Appellant*.

No. 20-5688

Appeal from the United States District Court for the Eastern District of Kentucky at Frankfort.
Nos. 3:19-cr-00010-1; 3:20-cr-00002-1—Gregory F. Van Tatenhove, District Judge.

Argued: April 22, 2021

Decided and Filed: May 5, 2022

Before: KETHLEDGE, STRANCH, and BUSH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** James M. Inman, GREEN CHESNUT & HUGHES, PLLC, Lexington, Kentucky, for Appellant. Sonja M. Ralston, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** James M. Inman, GREEN CHESNUT & HUGHES, PLLC, Lexington, Kentucky, for Appellant. Sonja M. Ralston, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

KETHLEDGE, J., delivered the opinion of the court in which BUSH, J., joined. STRANCH, J. (pp. 14–30), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

KETHLEDGE, Circuit Judge.　At issue in this case is whether Congress has plenary power to regulate the conduct of American citizens after they travel overseas.　Micky Rife, a Kentucky-born U.S. citizen, travelled to Cambodia and, years later, sexually abused two girls. After returning to Kentucky, he pled guilty to engaging in illicit sexual conduct abroad in violation of 18 U.S.C. § 2423(c).　Rife now argues that Congress lacked power to regulate the conduct for which he was convicted.　We agree with him that Congress's power under the Foreign Commerce Clause does not support his conviction.　But we also conclude—based on Supreme Court precedent alone—that § 2423(c) as applied here was within Congress's power to enact legislation implementing treaties.　We therefore affirm his conviction.

I.

In September 2012, Rife moved from Kentucky to Phnom Penh, Cambodia.　There, he took a position as an elementary-school teacher, began a relationship with a Cambodian woman, and adopted a young Cambodian girl.　(One may suspect that these relationships were not what they seemed, but the record here contains no information to that effect.)　For the next six years, Rife lived and worked exclusively in Cambodia, obtaining each year an "Extension of Stay" temporary visa through his U.S. passport.　Rife did not visit the United States during that period, though he maintained a bank account and property in Kentucky.

In 2018, Cambodian authorities opened an investigation into allegations that Rife had sexually assaulted his young female students.　One girl reported that, on more than one occasion when she was four or five years-old, Rife tossed her up into the air and touched her vagina underneath her clothing; she also said he put his fingers inside her vagina, which hurt.　A second girl reported that, when she was seven or eight, Rife put his hand underneath her clothing and put his fingers on her vagina while he was carrying her—and that "it happened many times."

That December, based upon information received from Cambodian authorities, Rife's school terminated his employment.　Four days later he voluntarily returned to Kentucky, where

federal agents soon interviewed him about his actions in Cambodia.  Rife told them he had been fired for "mishandling kids," and eventually confessed to abusing two of his female students as described above.  The agents arrested him.

A federal grand jury soon indicted Rife on two counts (one for each victim) of illicit sexual conduct in a foreign place, in violation of 18 U.S.C. § 2423(c).  That statute punishes any United States citizen or lawful permanent resident "who travels in foreign commerce or resides, either temporarily or permanently, in a foreign country, and engages in any illicit sexual conduct with another person."  Section 2423(f) in turn defines "illicit sexual conduct" to mean noncommercial or commercial sex acts with a person under age 18, or the production of child pornography. The government did not allege that Rife offered anything of value in connection with his abuse of the two girls; hence the parties agree that his "illicit sexual conduct" was noncommercial in nature.  *See* 18 U.S.C. §§ 2423(f)(1), 2246(2)(D).

Rife moved to dismiss the indictment, arguing that Congress lacked constitutional authority to punish him for noncommercial acts of sexual abuse that occurred in a foreign country years after he had travelled there. The government countered that the application of § 2423(c) to Rife's conduct was authorized by two powers granted to Congress under Article I: first, the Foreign Commerce Clause; and second, the Necessary and Proper Clause, which among other things empowers Congress to enact legislation to implement treaties—the relevant treaty here being the "Optional Protocol to the United Nations Convention on the Rights of the Child on the Sale of Children, Child Prostitution and Child Pornography," which the United States ratified in 2002.  The district court denied Rife's motion to dismiss, passing over the foreign commerce issue but upholding § 2423(c) as a valid exercise of Congress's power to implement the Optional Protocol.

Rife then entered a conditional plea of guilty to one count of illicit sexual conduct, 18 U.S.C. § 2423(c), admitting the facts recited above but reserving the right to appeal the court's denial of his motion to dismiss.  The court sentenced Rife to 252 months' imprisonment, to be followed by 20 years of supervised release.  This appeal followed.

II.

Rife challenges the constitutionality of 18 U.S.C. § 2423(c) as applied to him. The government, for its part, again argues that the Foreign Commerce Clause, as well as Congress's power to implement treaties under the Necessary and Proper Clause, authorized that application. Both of the government's arguments thus present constitutional questions; we address each in turn.[1]

We review de novo whether § 2423(c) was a valid exercise of Congress's power as applied to Rife's conduct. *See United States v. Abdulmutallab*, 739 F.3d 891, 905 (6th Cir. 2014).

A.

1.

The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. Const. Art. I, § 8, cl. 3. The public meaning of "commerce" at the time of the Constitution's ratification was hardly obscure; indeed Justice Thomas's explication of it is largely uncontested. *See United States v. Lopez*, 514 U.S. 549, 586 (1995) (Thomas, J., concurring). We only briefly reiterate that explication here. "Commerce," at that time, meant "trade" or economic "intercourse," which consisted of

---

[1]The concurring opinion suggests that we should decide this case simply by citing *Missouri v. Holland*, 252 U.S. 416 (1920)—without otherwise addressing either of the government's constitutional arguments. As an initial matter, *Holland* itself might rest on shaky ground, which is reason not to address these arguments piecemeal. *See generally Bond v. United States*, 572 U.S. 844 (2014). And the concurring opinion's concerns about "the limits to our power under Article III" (Op. at 1) are misplaced: the government presents these arguments not as an academic matter, but as grounds to uphold Rife's conviction and 21-year prison sentence. Every circuit court to address the constitutionality of § 2423(c) has addressed the question whether that provision falls within Congress's power under the Foreign Commerce Clause. That we disagree with those courts is no reason for our court alone not to address the issue: to the contrary, "debate *among* the courts of appeals" is what "sufficiently illuminates the questions that come before [the Supreme Court] for review." *U.S. Bancorp Mortgage Co. v. Banner Mall Partnership*, 513 U.S. 18, 26 (1994) (emphasis in original). In *United States v. Park*, 938 F.3d 354 (D.C. Cir. 2019)—which the concurring opinion cites with approval—the D.C. Circuit addressed both the constitutional questions presented here. We do the same.

"exchange of one thing for another," "interchange," or "traffick." *See, e.g.,* 1 S. Johnson, A Dictionary of the English Language 422 (6th ed. 1785). In *The Federalist Papers*, John Jay, Alexander Hamilton, and James Madison each used the words "commerce" and "trade" interchangeably. *See, e.g.,* The Federalist No. 7 (Hamilton) (discussing "competitions of commerce" between States as a result of state "regulations of trade"). So did the Antifederalists. *See Lopez*, 514 U.S. at 586 (Thomas, J., concurring). Federalists and Antifederalists alike also distinguished "commerce" from manufacturing and agriculture. *See, e.g.,* The Federalist No. 36 (Hamilton) (referring to "agriculture, commerce, manufactures"). Commerce itself, then, meant trade and transportation thereof, as opposed to activities preceding those things. *See Lopez*, 514 U.S. at 585 (Thomas, J., concurring); *United States v. Al-Maliki*, 787 F.3d 784, 792 (6th Cir. 2015).

Consistent with that understanding—particularly the "transportation thereof" part—Chief Justice Marshall later explained that the power to regulate commerce included the power to regulate "navigation" and the streams (figuratively speaking) of foreign or interstate commerce, all the way up to their headwaters in a particular State. *Gibbons v. Ogden*, 22 U.S. 1, 72, 74 (1824). And Justice Story added that Congress's power to regulate commerce included the power to punish acts that "interfere with, obstruct, or prevent the due exercise of the power to regulate commerce and navigation with foreign nations, and among the states." *United States v. Coombs*, 37 U.S. 72, 78 (1838).

None of this history is controversial. Indeed, two of the "three broad categories of activity that Congress may regulate under its commerce power," *Lopez*, 514 U.S. at 558 (majority opinion), roughly track this historical understanding. In *Lopez* the Court wrote about those "broad categories" with respect to interstate commerce in particular. "First, Congress may regulate the use of the channels of interstate commerce." *Id.* "Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities." *Id.* The Court's departure from the original meaning of "commerce" came in the third category: summarizing the Court's caselaw, again with respect to interstate commerce in particular, the Court in *Lopez* recited that "Congress' commerce authority includes the power to regulate" not

only commerce itself, but also "those activities that substantially affect interstate commerce." *Id.* at 558-59.

In the 80 years since the Supreme Court added that third category to Congress's power to regulate interstate commerce—an addition that has come to overshadow the original structure to which it was attached—the Court has not extended it to Congress's power to regulate under the Foreign Commerce Clause. *See Baston v. United States*, 137 S. Ct. 850, 852 (2017) (Thomas, J., dissenting from denial of certiorari) (observing that the federal circuit courts have been "[w]ithout guidance from this Court as to the proper scope of Congress' power under this Clause"). Thus, a threshold question here is whether we must or should extend that addition to Congress's foreign-commerce power ourselves.

2.

Our answer to that question rests on first principles. Law is a public act. Its meaning depends not on the secret intentions of lawgivers, but on the meaning understood by the people bound by it. Basic principles of due process require no less. Meanwhile, the creation of positive law—meaning statutes and the Constitution itself—can occur only pursuant to the procedures prescribed in the Constitution. For statutes, those procedures are bicameralism and presentment. *See* Art. I, § 7. For the Constitution—setting aside its original ratification under Article VII—those procedures are the ones prescribed in Article V. Thus, for statutes and constitutional provisions alike, there is a straight line from the constitutional requirements for making law; to a text that has met those requirements; to the meaning that the citizens bound by that text would have ascribed to it, which is to say its original meaning; and to what is then the law, which as judges we are bound to apply. Hence the Constitution's original meaning is law, absent binding precedent to the contrary.

There is no such precedent here. *See Baston*, 137 S. Ct. at 852 (Thomas, J., dissenting). Nor do we otherwise see any compulsion to add to the Foreign Commerce Clause the revisionist structure that, 80 years ago, the Supreme Court added to the Interstate Commerce Clause. (That addition, it bears mention, came during a period of national exigencies peculiar to interstate commerce—namely a national Depression ever since known as such, and (in *Wickard v. Filburn*,

317 U.S. 111 (1942)) the beginnings of a nationwide war effort.)  True, Justice Blackmun once observed in dicta that, "[a]lthough the Constitution grants Congress power to regulate commerce 'with foreign Nations' and 'among the several States' in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be the greater." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979) (citation omitted).  But in that comparison the Founders surely did not have the current interstate-commerce power in mind.

The government asserts that "considerations of federalism and state sovereignty" are absent "in the foreign context[,]" and thus that "the primary rationale for limiting Congress's power over interstate commerce does not touch the authority of the Congress in the regulation of foreign commerce."  Gov't Br. at 27 (internal quotation marks omitted).  That argument is as remarkable as it is unfortunate.  The "primary rationale" for limiting Congress's power is not that those limits support one theory of political science or another.  The rationale, rather, is that those limits are part of a *written constitution* that is "the supreme Law of the Land" and that every federal officer is sworn to uphold.  U.S. Const. Art. VI, cl. 2; *see also Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("The powers of the legislature are defined, and limited; and that those limits may not be mistaken, or forgotten, the constitution is written"); The Federalist No. 45 (Madison) ("The powers delegated to the federal government are few and defined").  That the Constitution marks out limitations to federal power—standing alone—compels us to enforce them.

In sum, to determine whether Rife's conviction under 18 U.S.C. § 2423(c) was supported by the Foreign Commerce Clause, we ask whether his conduct fell within Congress's power to "regulate Commerce with foreign Nations," as that power was originally understood.

3.

That analysis is straightforward.  Rife's molestation of his two victims was undisputedly noncommercial, and thus was not itself trade or commerce of any kind.  True, Rife met his victims at the school where he taught; but the government concedes that his abuse conduct was itself in no way commercial.  That distinguishes this case from *United States v. Park*, 938 F.3d 354 (D.C. Cir. 2019), upon which the government and the concurring opinion rely here.  There,

the government charged Park in a single count, alleging both sexual abuse and production of child pornography, in violation of § 2423(c). *Id.* Thus, the court reasoned, "the indictment stands so long as Congress had the authority to reach either type of conduct." *Id.* at 364. And production of child pornography, the court said, "may rationally be viewed as quintessentially economic activity." *Id.* at 372. Moreover, "Park was able to meet and introduce himself" to his sexual-abuse victim "by offering English lessons." *Id.* at 374. Indeed Park lured his victim into his apartment that way. *Id.* "Trade" was thus literally part of the abuse conduct there. But here the government did not allege any such trade; and even the court in *Park* expressly recognized "the possibility that some applications of this statute may exceed Congress's authority[.]" *Id.*

Rife's abuse of his two victims was likewise not part of any transportation or traffic in foreign commerce. To the contrary, Rife had ceased travelling in foreign commerce when he arrived in Cambodia years before. The government counters that § 2423(c) has what it calls a "jurisdictional hook"—namely (as charged here) that that defendant has "travel[led] in foreign commerce"—which in the government's view cures any defect in Congress's power to reach Rife's conduct here. Gov't Br. at 34. To that end the government cites *United States v. Henry*, 429 F.3d 603, 620 (6th Cir. 2005), which was a felon-in-possession case where a jurisdictional element of the offense was that the firearm and ammunition possessed by the defendant had "been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g). That element, we held, was enough to bring Henry's possession of the gun and ammunition within Congress's power to regulate interstate commerce. (We set to one side that *Henry* involved the substantial-effects power under *Lopez*—a power we decline to recognize here.) But a gun itself is commerce—because the gun itself is part of the trade—in a way that people usually are not. The gun's analogue in our case is not the person, but the transportation itself. And the bare fact that an American "travels in foreign commerce" does not empower Congress to regulate, under the Foreign Commerce Clause, everything that American does afterward. That is the plain implication of the government's argument here: that, once an American citizen travels in foreign commerce, the federal government has a police power to regulate (or proscribe) *any* conduct that citizen might engage in overseas, from marrying a foreign national to consuming *foie gras*. Congress has no such power.

The government also likens this case to *United States v. Coleman*, 675 F.3d 615 (6th Cir. 2012), where we upheld a requirement that convicted sex offenders must "register" their new address when they move (in the sense of changing their residence) from one state to another. *See* 18 U.S.C. § 2250. True, the offense there, like the one here, had as an element that the defendant had "travel[led] in interstate or foreign commerce[.]" *Id*. § 2250(a)(2). But there the defendant's movement in interstate commerce, standing alone, was a criminal offense if he did not update his address on a national sex registry. We therefore held that § 2250 was a valid exercise of Congress's power to regulate "the channels and instrumentalities of interstate commerce[.]" 675 F.3d at 621. Here, Rife's travel to Cambodia was not itself a criminal offense. And the government's argument here—that the "travels in interstate or foreign commerce" element empowers the government to regulate any conduct or omission that follows—again amounts to an assertion of a federal police power over the conduct of American citizens overseas.

In sum, Rife's conviction under 18 U.S.C. § 2423(c) for molesting his two victims in Cambodia, years after he travelled there, and without any commercial exchange, was not an exercise of Congress's power to "regulate Commerce with foreign Nations[.]" His conviction cannot stand on that ground.

B.

1.

That leaves the question whether we can uphold Rife's conviction as an exercise of Congress's power to enact legislation implementing a treaty. Article I grants Congress the power "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. Art. I, § 8, cl. 18. Meanwhile, Article II grants the President the "Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." *Id*. Art. II, § 2, cl. 2. "Read together, the two Clauses empower Congress to pass laws 'necessary and proper for carrying into Execution . . . [the] Power . . . to make Treaties.'" *Bond v. United*

*States*, 572 U.S. 844, 874-75 (2014) (Scalia, J., concurring in the judgment) (alterations in original). (Here, we call this power the "power to implement treaties.")

That Rife's conviction was not supported by the Foreign Commerce Clause means that none of Congress's enumerated powers—other than its power to implement treaties—supports that conviction. Hence the question here is the same question that the Supreme Court declined to reach in *Bond*. *See* 572 U.S. at 854-55.

That question is whether the President and two-thirds of the Senate, by the sole fact of their consent to a treaty, can empower Congress to enact legislation that it otherwise could not enact by the exercise of its enumerated powers in Article I. The implications of that question are "seismic[,]" because the prevailing view appears to be that "the Treaty Clause comes with no implied subject-matter limitations." *Bond*, 572 U.S. at 877 (Scalia, J., concurring in the judgment). For if the Treaty Power has no subject-matter limitations, Congress's power to enact laws that implement treaties would not have any subject-matter limitations either. (The concurring opinion's assurance that an implementing statute must have a "plain" connection with the relevant treaty, Op. at 16, only underscores the absence of any meaningful constraints upon this putative power.) The Necessary and Proper Clause would become a portal, through which Congress would leave behind its limited powers and exercise, at last, an unlimited one. For example, a treaty addressing climate change—or an international convention for the prevention of infectious diseases—might empower Congress to regulate virtually any conduct it chose. Congress would be "one treaty away from acquiring a general police power." *Id*. at 879.

2.

The question, differently stated, is whether one organ of government can expand the powers of another, notwithstanding the fundamental law's manifest object to constrain them both. The Founding generation was acutely familiar with that kind of question. In Anglo-American history, the struggle to limit governmental power reaches at least as far back as the 1215 version of Magna Charta, when the barons brought King John to heel—and stopped his practice of attacking them with mercenary troops—by eliciting at sword-point a promise to exercise his coercive powers pursuant only to the ancient law of the land. *See* Magna Charta

¶ 39 (1215); McIlwain, *Constitutionalism and the Changing World* (hereinafter "*Constitutionalism*") 103-06 (Cambridge 1939). But more germane to our purposes—not least because many of the early colonists witnessed it firsthand—was the effort by judges and Parliament in the 17th century to resist the Stuart monarchs' claims of unlimited power. Not long after his coronation in 1603, King James I asserted a putative royal power to declare what the law is; but Edward Coke, then Chief Justice of the Court of Common Pleas, told James to his face that only judges in a court of law could do that. *See Case of Prohibitions*, 12 Coke R. 64 (1607). James also asserted a power to legislate unilaterally by proclamation; but again Coke pointedly advised him he could not. *See Case of Proclamations*, 12 Coke R. 74 (1610). After James's death his son, Charles I, asserted a power of extracting "forced loans" from the nobles of his day—an early version of taxation without consent—and denied the writ of habeas corpus to nobles who refused to provide them. *See* Maitland, *The Constitutional History of England* 307 (Cambridge 1908). Parliament responded with the 1628 Petition of Right—orchestrated by Coke, who was then a member of Parliament, after James had dismissed him from the bench twelve years before—which became law and banned these practices (along with quartering "soldiers and mariners" in citizens' homes) when Charles consented to the petition. *See* 1628 Petition of Right, para. X; 3 *The Selected Writings of Sir Edward Coke* 1224-35 (Liberty Fund 2003); Maitland, *Constitutional History* 307. Much of this history and the law embodied in it was memorialized by Coke in his *Reports* and *Institutes*, which the colonists brought with them to America. *See* Bailyn, *The Ideological Origins of the American Revolution* 30-31 (Harvard 1992) ("Coke is everywhere in the [legal] literature" of the colonies).

Closer to the mark here was Parliament's claim in the 18th century that Parliament itself was sovereign—meaning that above Parliament there was no law, and thus that its power was unlimited. McIlwain, *Constitutionalism* 62-64. In the 1760s, Parliament exercised such power by passing various statutes to tax the American colonists, even though they lacked representation in Parliament and thus had not consented to any taxes. For centuries, consent to taxation—or to any statute affecting individual rights—had been a requirement of what was known by then as the English constitution. Maitland, *Constitutional History* 68. Yet Parliament made its assertion of unlimited power over the colonies clear in the Declaratory Act of 1766, which stated that Parliament "had, hath, and of right ought to have, full power and authority to make laws and

statutes of sufficient force and validity to bind the colonies and people of America, subjects of the crown of Great Britain, *in all cases whatsoever*." 6 Geo. 3, ch. 12 (1766) (emphasis added). The Massachusetts Circular Letter of 1768, written by Samuel Adams, declared in response "that in all free States *the constitution is fixed*; and as the supreme legislative derives its power and authority from the constitution, it cannot overleap the bounds of it, without destroying its own foundation[.]" (Emphasis added.) McIlwain—among American historians, the preeminent expositor of constitutionalism—concluded: "The American Revolution itself, so far as its causes were theoretical, had been fought on this issue." McIlwain, *Constitutionalism* 67.**[2]**

3.

In light of this history, the idea that the Founding generation would have included in the Constitution—as part of an ancillary power of Article I, no less—a hidden power to "overleap the bounds" of all the other powers in that Article, and to legislate "in all cases whatsoever," is simply implausible. The Revolution was fought in opposition to the Declaratory Act, not to make it the supreme law of the land. Chief Justice Marshall recognized as much when he wrote that "a great substantive and independent power . . . cannot be implied as incidental to other powers, or used as a means of executing them." *McCullough v. Maryland*, 17 U.S. 316, 411 (1819). Yet the government asks us to recognize such a power here. That the conduct at issue in the case occurred overseas is merely a fortuity: the principle it advocates would enable Congress,

---

**[2]**Although the concurring opinion calls our analysis "quasi-historical" and "anecdotal," Op. at 18, the concurring opinion does not actually contest any historical proposition in our opinion. (Notably, the concurring opinion offers no support for *Lopez*'s substantial-effects test.) In a sense, of course, all history is anecdotal—as the word itself suggests. And as for "methodology," Op. at 14, Magna Charta is a primary source; so are Coke's opinions in the *Case of Prohibitions* or the *Case of Proclamations*; so is the 1628 Petition of Right; so is the Declaratory Act of 1766; so is the Massachusetts Circular Letter of two years later. True, the McIlwain, Bailyn, and Maitland sources cited here are secondary. Among historians of 18th-century America, however, McIlwain was a towering figure in the first half of the 20th century, as Bailyn was in the second. McIlwain won a Pulitzer for his book-length treatment of precisely the "causes" proposition cited here, *see* McIlwain, *The American Revolution: A Constitutional Interpretation* (Macmillan 1923); Bailyn won a Pulitzer for *Ideological Origins* (and two decades later won another). And Maitland is iconic enough among English legal historians to count nearly as a primary source, like Bracton and Fortescue centuries before. Of course, if any lawyer or judge disagrees with the conclusions of these historians, they can say as much—and explain why.

with the right treaty, to regulate any conduct it chooses domestically. And that Rife's conduct deserves severe punishment does not allow us to authorize it contrary to law.

But as to Congress's power to implement treaties—unlike its power to regulate commerce with foreign nations—we do not write on a relatively clean slate. In *Missouri v. Holland*, 252 U.S. 416 (1920), the Supreme Court considered the constitutionality of the Migratory Bird Act of 1918. That statute, like the one here (as applied to Rife at least), appeared not to have been authorized by any of Congress's enumerated powers under Article I. But the 1918 Act was passed to implement a recent treaty of the same name. The Court held, in a sentence regarded since as *ipse dixit*: "If the treaty is valid there can be no dispute about the validity of the statute under Article I, Section 8, as a necessary and proper means to execute the powers of the Government." *Id*. at 432.

That holding binds us here. The Optional Protocol is undisputedly a valid treaty; and we cannot say that § 2423(c) as applied to noncommercial sex offenses against children is so unrelated to the treaty's provisions as to put this case beyond the Court's holding in *Holland*. *See United States v. Comstock*, 560 U.S. 126, 134 (2010). Based on *Holland* alone, therefore, we uphold Rife's conviction.

\*     \*     \*

The district court's judgment is affirmed.

---

**CONCURRING IN THE JUDGMENT**

---

JANE B. STRANCH, Circuit Judge, concurring in the judgment. Though I agree with the ultimate result in this case, I concur in the judgment only and write to express why I differ with the analysis of the opinion.

My disagreement is undergirded by the opinion's failure to acknowledge that the "fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). Judicial restraint originates from the limits to our power under Article III, *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 755 (6th Cir. 2019) (citing U.S. Const. art. III, § 2; *Rescue Army v. Mun. Ct. of L.A.*, 331 U.S. 549, 568–71 (1947)), and has long governed the courts. In 1936, Justice Brandeis marshalled the Court's extensive precedent supporting judicial restraint to offer rules emanating from that principle, including that we should not rule on constitutional questions "unless absolutely necessary to a decision of the case," and we should not create constitutional rules that stretch beyond the applicable facts of the dispute at hand. *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (quoting *Burton v. United States*, 196 U.S. 283, 295 (1905)); *Torres*, 938 F.3d at 754. Such restraint was appropriate here as our opinion affirms the district court on the narrow grounds that 18 U.S.C. § 2423 does not exceed Congress's treaty power as applied to Micky Rife. The long history of judicial restraint jurisprudence thus counsels against addressing constitutional questions concerning the Foreign Commerce Clause in this case.

I am concerned, then, about the extent of the issues on which the majority opines but also disquieted by some of the substance. I agree, for example, that § 2423(c) is constitutional under the treaty power but I cannot agree with the path the opinion takes to reach that decision. It does so by first taking the musings on the Foreign Commerce Clause from *United States v. Al-Maliki*, 787 F.3d 784 (6th Cir. 2015), and then reaching beyond those musings to decide that § 2423(c) is outside the bounds of Congress's Foreign Commerce Clause power. Our holding today does not

depend on that clause. Addressing the Foreign Commerce Clause oversteps our boundaries.[1] In addition to this circuitous route, I am concerned about the method of analysis regarding the treaty power. Only after significant comments in dicta on the limits of the treaty power does the opinion apply the prevailing law and begrudgingly acknowledge that § 2423(c) as applied in this case is constitutional. I agree with that decision but disagree with the reasoning leading up to it.

In sum, my decision to concur in the judgment grows from my objections to the analytical treatment of the treaty power and the Foreign Commerce Clause, both as to substance and process. The opinion, in my estimation, places the Sixth Circuit out of step with our sister circuits and the governing case law and compels me to provide a response.

## A. The Foreign Commerce Clause

The Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes[.]" U.S. Const. art. I, § 8, cl. 3. Since the early 19th century, the Supreme Court has recognized that the term "commerce" "must carry the same meaning throughout the sentence, and remain a unit, unless there be some plain intelligible cause which alters it." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 194 (1824). The Court further explained that the definition of "commerce" encompasses "every species of commercial intercourse" between two parties. *Id.* at 193. Courts, therefore, have typically considered the reach of the Foreign Commerce Clause in dialogue with the Indian Commerce and Interstate Commerce Clauses. *See, e.g.*, *United States v. Park*, 938 F.3d 354, 370 (D.C. Cir. 2019).

The latter is the most discussed in the case law. Although referring to the "commerce power" in the main, the Supreme Court has defined "three general categories of regulation in which Congress is authorized to engage under its commerce power" within the interstate

---

[1]The majority notes that the D.C. Circuit's opinion in *United States v. Park*, 938 F.3d 354 (D.C. Cir. 2019), explored how both the Foreign Commerce Clause and the treaty power support the constitutionality of § 2423(c). I cite *Park*, but not to suggest that *Park*'s belt-and-suspenders approach was necessary or the proper way to proceed. The opinion in *Park* was decidedly thoughtful and offers careful analyses of both sources of congressional power. Because the majority considers both constitutional issues, it makes sense to reference our sister circuit's lengthy consideration of the same.

framework.  *Gonzales v. Raich*, 545 U.S. 1, 16 (2005).  Congress has the power to regulate (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, meaning those means used to transport good or people in interstate commerce, and (3) activities substantially related to interstate commerce.  *United States v. Lopez*, 514 U.S. 549, 558 (1995).  The constraints defined through these three categories are not illusory.  In *Lopez*, the Supreme Court held that a statute criminalizing the possession of a firearm in a school zone was unconstitutional because the law failed to fit within any of the three categories.  *Id.* at 561–62, 567.  The Court reached a similar result in *United States v. Morrison* when it struck down sections of the Violence Against Women Act that lacked a substantial relationship to interstate commerce.  529 U.S. 598, 617 (2000).  Left unanswered, however, is whether or to what extent this framework applies to cases involving the Foreign Commerce Clause.  Our sister circuits have reached different conclusions on the issue, and until this case, we have not ruled on it.  *Compare United States v. Pendleton*, 658 F.3d 299, 308 (3d Cir. 2011) (using the *Lopez* framework in concluding that the Foreign Commerce Clause gives Congress the power to enact § 2423(c)), *with United States v. Bollinger*, 798 F.3d 201, 215 (4th Cir. 2015) (explaining "that the *Lopez* categories provide a useful starting point in defining Congress's powers under the Foreign Commerce Clause," but concluding that the Foreign Commerce Clause power is broader).

The majority opinion, however, rejects the *Lopez* framework entirely, contending that there is no "compulsion to add to the Foreign Commerce Clause the revisionist structure that, 80 years ago, the Supreme Court added to the Interstate Commerce Clause."[2] Op. at 6.  I cannot agree with this appeal to "first principles" or to the vague premise of originalism as justification

---

[2]The majority's statement that the *Lopez* framework was "added" to the Interstate Commerce Clause—and therefore implicitly illegitimate—misunderstands the underlying reason for use of that framework.  As Professor Richard Fallon has explained, the three- and four-part tests common to constitutional law and exemplified in the *Lopez* framework are best understood as providing the means of implementing the purposes behind constitutional provisions.  Richard H. Fallon, Jr., *Foreword: Implementing the Constitution*, 111 Harv. L. Rev. 56, 57 (1997).  In the case of the Interstate Commerce Clause, "[t]he *Lopez* categories . . . are doctrinal approximations adopted by the Supreme Court to systematize its case law concerning interstate commerce within a broader structural understanding of the relationship between state and federal power."  Gerald L. Neuman, *Extraterritoriality and the Interest of the United States in Regulating Its Own*, 99 Cornell L. Rev. 1441, 1450 (2014).

to jettison the Supreme Court's Interstate Commerce Clause jurisprudence. *Id.* Nor am I comfortable with the conclusions, primarily citing to Supreme Court concurrences and dissents, as to the "original meaning" of "commerce" at ratification or the insistence that *this* "original meaning is law, absent binding precedent to the contrary." *Id.* To begin with, the relevant creators and audience for this "public meaning" are left unclear, and the history that the majority advances fails to recognize that, particularly with respect to the Constitution, "the past is seldom neat and tidy." Larry D. Kramer, *When Lawyers Do History*, 72 Geo. Wash. L. Rev. 387, 401 (2003). We as judges should "respect the limits of historical interpretation, which preserves a healthy space for concluding that something remained open or was not fully appreciated or understood." *Id.* at 407. I can agree with my colleagues, however, that the Founders of this nation drafted the Constitution in an era alien to our own, particularly with respect to the ways in which commerce of all types would exist. But that conclusion neither proves that history actually comports with the "original meaning" proposed here nor does it undercut Supreme Court precedent on the subject.

The purported "original meaning," moreover, offers little certainty about the best application of our constitutional structure to novel issues like the one presented in this case. Indeed, it is not difficult to find historical sources and case law signaling that the Founders envisioned the Foreign Commerce Clause as granting *greater* power to Congress than its interstate compatriot and understood "commerce" much more broadly than the majority suggests. Samuel Johnson's dictionary, a commonly cited source[3] for understanding language used at the Founding, offers a much broader definition of "commerce" than the majority allows in its version of "original public meaning." "Commerce," according to Johnson in 1785, is "[i]ntercourse; exchange of one thing for another, interchange of any thing; trade; traffick" and "common or familiar intercourse." Samuel Johnson, A Dictionary of the English Language (7th ed. 1785) (unpaginated). "Commerce," therefore covered more than economic activity and included "interactions, exchanges, interrelated activities, and movements back and forth,

---

[3]Justice Scalia, for example, cited to the 1773 edition of Samuel Johnson dictionary in *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008). The Supreme Court has frequently leaned on Johnson's definitions when invoking the Founders' understanding of constitutional terms. *See, e.g.*, *Torres v. Madrid*, 141 S. Ct. 989, 996 (2021); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 813 (2015).

including, for example, travel, social connection, or conversation." Jack M. Balkin, *Commerce*, 109 Mich. L. Rev. 1, 15–16 (2010). As explained in *Gibbons v. Ogden*: "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." 22 U.S. at 189–90. Historians have concluded that "commerce" at the Founding included "every species of gainful activity carried on by Americans with foreign Nations," even sweeping in naturalization laws based on their effect on manufacturing in the United States. William W. Crosskey, 1 Politics and the Constitution in the History of the United States 117, 129–30 (1953). The requirement that these activities occur "with foreign Nations," in turn, provides a nexus requirement that reaches beyond our Nation's borders. The text of the Foreign Commerce Clause offers only two constraints on congressional action: that the action (1) "regulate Commerce" and (2) concern commerce "with foreign Nations." *See Bollinger*, 798 F.3d at 213. That specification of power, combined with the Necessary and Proper Clause, reaches more than direct economic transactions.

As to the extent of Congress's power over commerce, James Madison described the regulation of foreign commerce as "the great and essential power," in comparison to the "supplemental" power of the Interstate Commerce Clause. Federalist No. 42, at 283 (James Madison) (Jacob E. Cooke ed., 1961); *see also* 3 The Records of the Federal Convention of 1787, at 478 (Max Farrand ed., 1911) (February 13, 1829 letter from James Madison). "[T]here can be little doubt that the [Framers'] major preoccupation was with foreign trade and that the power over interstate commerce, while coordinate in expression, was distinctly secondary in scope and intended operation." Albert S. Abel, *The Commerce Clause in the Constitutional Convention and in Contemporary Comment*, 25 Minn. L. Rev. 432, 469 (1941). It is true that the Supreme Court has yet to specify exactly how its century of cases delineating the scope of the Interstate Commerce Clause apply to cases involving the Foreign Commerce Clause. But the Court has implicitly rejected reading the Foreign Commerce Clause more narrowly than the Interstate Commerce Clause. Indeed, it has embraced the broad reach of Congress's powers under that clause: In *Japan Line, Ltd. v. Los Angeles County*, the Court determined that "there is

evidence that the Founders intended the scope of the foreign commerce power to be the greater." 441 U.S. 434, 448 (1979). We are bound to follow what the Supreme Court has told us.

In some sense, the majority is correct. We can and should distinguish the Foreign Commerce Clause and the Interstate Commerce Clause because the constraints inherent in the latter lack the same justification when applied to the Foreign Commerce Clause. *Bd. of Trs. of Univ. of Ill. v. United States*, 289 U.S. 48, 59 (1933). But those constraints work against the majority's conclusions. Federalism—the driving concern of limits on the Interstate Commerce Clause—has no impact on a power focused on permitting the United States to speak with one voice. *See, e.g.*, *Japan Line*, 441 U.S. at 448; *Morrison*, 529 U.S. at 615; *see* Neuman, *supra*, at 1500–01. In *NLRB v. Jones & Laughlin Steel Corp.*, for example, the Supreme Court explained that the power to regulate interstate commerce "must be considered in the light of our dual system of government and may not be extended" so far as to "obliterate the distinction between what is national and what is local and create a completely centralized government." 301 U.S. 1, 37 (1937). *Lopez*'s anxiety that the expansion of congressional authority under the Interstate Commerce Clause would create in the federal government "a general police power of the sort retained by the States," 514 U.S. at 567, undoubtedly also rests on federalism. Thus, the Court explained that federalism in Interstate Commerce Clause jurisprudence is driven by the principle that "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Id.* at 552 (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991)).

In contrast, the Foreign Commerce Clause signals the need for a unified federal action in interactions among sovereign nations. "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Bd. of Trs. of Univ. of Ill.*, 289 U.S. at 59. There is no federalism issue because the federal government's actions on the international stage do not encroach upon the power of the states. *See id.* The Court has long instructed that on issues of international significance, federal authority is at its strongest. "The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the

enumerated powers, *is categorically true only in respect of our internal affairs.*" *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 315–16 (1936) (emphasis added). The Court has more recently explained that "[i]n a world that is ever more compressed and interdependent, it is essential the congressional role in foreign affairs be understood and respected." *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015).

One could imagine an additional objection to an expansive Foreign Commerce Clause— that incorporation of the Interstate Commerce Clause framework into the Foreign Commerce Clause context will impinge on the sovereignty of other nations. The opposite is true. The PROTECT Act does not challenge foreign sovereignty, but instead reinforces a consensual, international regulatory framework that allows the United States to target the conduct of its own citizens and permanent residents only. And it has long been recognized that "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991); *see also Blackmer v. United States*, 284 U.S. 421, 437 (1932). The Constitution lacks any clear expression of concern about the sovereignty of foreign nations. Unlike federalism, which is woven into the fabric of our constitutional structure, foreign national sovereignty features in neither the Constitution nor the Constitutional Amendments. *See United States v. Durham*, 902 F.3d 1180, 1205–06 (10th Cir. 2018), *cert. denied*, 139 S. Ct. 849 (2019). As the Supreme Court has explained, "foreign sovereign immunity is a matter of grace and comity on the part of the United States, and not a restriction imposed by the Constitution." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486 (1983). Broader foreign sovereignty concerns, therefore, should not constrain the Foreign Commerce Clause.

These differences from the Interstate Commerce Clause cannot lead us to read the Foreign Commerce Clause so narrowly as to make it the lesser power. Indeed, to construe it more narrowly than its interstate commerce counterpart, as the majority does, is to ignore clear judicial precedent and thoughtful scholarly analysis. *See, e.g.*, *Japan Line, Ltd.*, 441 U.S. at 448; Scott Sullivan, *The Future of the Foreign Commerce Clause*, 83 Fordham L. Rev. 1955, 1968 (2015) ("Court opinions agree that the scope of the Foreign Commerce Clause is, at the very least, decidedly broader than that of the Interstate Commerce Clause.").

The Indian Commerce Clause is perhaps the more apt guide for interpreting the limits of this power. As federal courts, including the Supreme Court, have long recognized, the parallel wording of the Foreign Commerce Clause and the Indian Commerce Clause requires that similar breadths of power be afforded under those clauses. *See, e.g.*, *Buttfield v. Stranahan*, 192 U.S. 470, 493 (1904) ("The power to regulate foreign commerce is certainly as efficacious as that to regulate commerce with the Indian tribes."); *Durham*, 902 F.3d at 1202. The Supreme Court has explicitly tied the two clauses to one another, explaining that Congress's "exclusive and absolute power to regulate commerce with the Indian tribes" is "a power as broad and as free from restrictions as that to regulate commerce with foreign nations." *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 194 (1876). Because the two clauses are read as parallel, we must account for the Court's more recent description of the Indian Commerce Clause as offering Congress "plenary power" to regulate commerce with Indian tribes. *United States v. Lara*, 541 U.S. 193, 200 (2004) (quoting *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989)). "Congress can (and has) invoked its power to regulate commerce with Indian Tribes and foreign nations to govern not merely trade and business but *all interactions* (and altercations) with those entities." Robert J. Pushaw, Jr. *Obamacare and the Original Meaning of the Commerce Clause: Identifying Historical Limits on Congress's Powers*, 2012 U. Ill. L. Rev. 1703, 1727 (emphasis added). Given the textual and precedential parallels between the clauses, then, the Foreign Commerce Clause must share the Indian Commerce Clause's expansive reach.

However, the extent of Interstate Commerce Clause jurisprudence provides the most complete analytic framework. We therefore should look to our Interstate Commerce Clause jurisprudence as a starting point—not a ceiling—for an evaluation of § 2423. Using the Interstate Commerce Clause framework as our analytical starting point, most of our sister circuits have adopted an "effects test" based on the third *Lopez* category. *See Park*, 938 F.3d at 372. The question, then, is whether Congress had a rational basis for concluding that the prohibited conduct, when aggregated, substantially affects foreign commerce. *Cf. Gonzales v. Raich*, 545 U.S. 1, 22 (2005) ("In assessing the scope of Congress' authority under the Commerce Clause, . . . . [w]e need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding.").

Here, the reasoning of our sister circuits that have addressed this exact issue provides helpful guidance.  All circuit courts to have considered this issue, save us, have found that the Foreign Commerce Clause provides Congress the power to enact § 2423(c).  *See Park*, 938 F.3d at 375; *United States v. Lindsay*, 931 F.3d 852, 863 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 1288 (2020); *Durham*, 902 F.3d at 1216; *Bollinger*, 798 F.3d at 219; *Pendleton*, 658 F.3d at 308.  As discussed above, there has not been universal agreement on the proper reach of the Foreign Commerce Clause, especially with respect to the framework established in Interstate Commerce Clause cases.  Some of our sister courts have directly imported the *Lopez* categories to the foreign context.  *See Pendleton*, 658 F.3d at 308.  Others have persuasively argued that the Foreign Commerce Clause is broader but have still generally gestured to the *Lopez* categories as helpful.  *See Bollinger*, 798 F.3d at 215; *U.S. v. Cummings*, 281 F.3d 1046, 1049 n.1 (9th Cir. 2002).  Finally, some of our sister courts have deviated more substantially from the *Lopez* framework to conclude that Congress has power to regulate foreign commerce when the statute shows "a constitutionally tenable nexus with foreign commerce."  *U.S. v. Clark*, 435 F.3d 1100, 1114 (9th Cir. 2006).  But none has concluded, as the majority does here, that the Foreign Commerce Clause does not grant Congress the power to prohibit U.S. citizens from committing child sex abuse abroad.

We need not, however, define what specific "effects test" to use, *see, e.g.*, *Durham*, 902 F.3d at 1207 ("substantial effect"); *Bollinger*, 798 F.3d at 215–16 (or "demonstrable effect[s]"), nor determine how faithfully we should apply the *Lopez* framework to Foreign Commerce Clause cases.  It suffices to say only that the Foreign Commerce Clause does provide Congress with the power required to enact § 2423(c) for non-commercial child sex abuse abroad.  The record leaves little doubt that there is a rational connection between the conduct prohibited in § 2423(c) and foreign commerce.  Congress enacted § 2423(c) to eliminate the "significant loopholes in the law that persons who travel to foreign countries seeking sex with children are currently using to their advantage in order to avoid prosecution."  H.R. Rep. No. 107-525, at 3 (2002).  As the district court noted, "because the United States is so effective, comparatively, at enforcing its criminal laws against child sexual abuse within its borders, and monitoring the convicted thereafter, the United States has inadvertently incentivized convicted sex offenders to relocate to foreign countries."  *United States v. Rife*, 429 F. Supp. 3d 363, 367 (E.D. Ky. 2019)

(citations omitted). In the congressional debates on the law, representatives cited the fact that American citizens were using the channels of foreign commerce to travel to countries where lax law enforcement and poverty make it easy to escape prosecution for sexual abuse of minors. *See* 148 Cong. Rec. H3884–85 (daily ed. June 25, 2002).

The PROTECT Act's criminalization of non-commercial child sex abuse by U.S. citizens living abroad supports the larger goal of eliminating commercial sexual child exploitation in the face of the "enforcement difficulties" that a more straightforward proof of transaction requirement would entail. *Cf. Raich*, 545 U.S. at 22. As the D.C. Circuit explained in response to this very question, "[p]roof of the commercial aspect of child sexual exploitation can be exceptionally elusive," even as international child sex tourists pay for goods and services to bring them in close contact with possible victims. *Park*, 938 F.3d at 373 (citing Najat Maalla M'jid, *Report of the Special Rapporteur on the Sale of Children, Child Prostitution and Child Pornography*, U.N. Doc. A/HRC/22/54, at 5 (Dec. 24, 2012)). Sexual predators' common means to access victims, moreover, often involve grooming behaviors, like giving gifts or money, to establish trust and manipulate the child. *Id.* (citing Georgia M. Winters & Elizabeth L. Jeglic, *Stages of Sexual Grooming: Recognizing Potentially Predatory Behaviors of Child Molesters*, 38 Deviant Behav. 724, 726 (2017)). Section 2423(c), therefore, falls within Congress's foreign commerce power because it tamps down demand for commercial arrangements contributing to and offering opportunities for sexual abuse abroad. *See id.*; *accord Lindsay*, 931 F.3d at 863.

The challenging question here is not whether the Foreign Commerce Clause allows Congress to regulate U.S. citizens' actions abroad, but instead whether as applied to Rife that necessary effect on commerce brings his conduct under this wide umbrella of congressional power. In *Park*, the D.C. Circuit recognized "the possibility that some applications of [§ 2423(c)] may exceed Congress's authority," but determined that the defendant's actions were sufficiently market-affecting because he was alleged to have "traveled throughout the world seeking out opportunities for child sex abuse." *Park*, 938 F.3d at 374. The record is not so neat here as evidence is scant that Rife traveled to, resided in, or sought employment in Cambodia for the purpose of abusing children. However, several facts signal that the application is nevertheless constitutional. First, the presentence report (PSR) specifically asserts that Rife

traveled to Cambodia to help him conceal his pattern of abuse and give him access to vulnerable victims through his work at a Cambodian elementary school. Rife did not object to this part of the PSR. Evidence in the record, moreover, supports that Rife used his position as a teacher to commit abuse, even committing some of his abuse while engaging in the "economic" activity that was his teaching role. It is also important that § 2423 contains no intent requirement. *See* H.R. Rep. No. 108-66, at 51 (2002) (Conf. Rep.) (amending § 2423 to address "a number of problems related to persons who travel to foreign countries and engage in illicit sexual relations with minors," including the requirement under earlier versions of the law that the government "prove that the defendant traveled with the intent to engage in the illegal activity"). Unlike § 2423(b), which requires the Government to prove that the "motivating purpose" of foreign travel is "illicit sexual conduct," § 2423(c) effectively imposes per se liability. Rife falls within the ambit of § 2423(c), and I see no reason to conclude that the Foreign Commerce Clause does not give Congress the power to criminalize behavior that our courts have long documented as having a significant economic component.

Because our agreed result here relies on the treaty power, however, we need not reach a decision on which exact path to take with the Foreign Commerce Clause. I write only to explain why I believe the interpretation the majority has chosen is simply incorrect.

## B. Treaty Power

Although the majority opinion upholds Rife's conviction based on its conclusion that 18 U.S.C. § 2423(c) is constitutional as applied to Rife under Congress's treaty power, it does so with significant protest. Rather than examine the underlying treaty and the relationship it bears to the PROTECT Act, the majority again relies on historical conclusions, without satisfactory explanation of its methodology for selecting its sources. It determines that "the Founding generation" would never have included such an expansive treaty power as the Supreme Court has squarely recognized.[4] Because I believe this issue requires more analysis, I write separately on this ground as well.

---

[4]The historical record challenges this assertion. Edmund Randolph, for example, explained during the debates over adopting the Constitution that its treaty language was

The Constitution's Treaty Clause provides that the President may enter treaties with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. The Necessary and Proper Clause, in turn, grants Congress the power to fill "regulatory gaps" left in the lacuna of its enumerated powers. *Sabri v. United States*, 541 U.S. 600, 607 (2004). Congress, therefore, has the "power to enact such legislation as is appropriate to give efficacy to . . . treat[ies]" that the President has entered with Senate advice and consent. *Neely v. Henkel*, 180 U.S. 109, 121 (1901). These two clauses work together such that "[i]f the treaty is valid there can be no dispute about the validity of the statute under Article I, § 8, as a necessary and proper means to execute the powers of the Government." *Missouri v. Holland*, 252 U.S. 416, 432 (1920). Congress's power emanating from the Necessary and Proper Clause is usually termed its "treaty power." *See Lara*, 541 U.S. at 201.

Our review of whether Congress has properly exercised its treaty power focuses on "whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *United States v. Comstock*, 560 U.S. 126, 134 (2010) (citing *Sabri*, 541 U.S. at 605). The question, then, is whether Congress's chosen means to effectuate a valid treaty are "'convenient, or useful,' or 'conducive'" to the treaty's end purpose. *Id.* at 134–35 (quoting *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 413 (1819)). "[T]he degree of their necessity, the extent to which they conduce to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone." *Id.* at 135 (quoting *Burroughs v. United States*, 290 U.S. 534, 548 (1934)).

The majority justifies its significant criticisms of this prescribed analysis by asserting that the Supreme Court's explication of the treaty power in *Missouri v. Holland*, 252 U.S. 416 (1920), is on "shaky ground" after *Bond v. United States*, 572 U.S. 844 (2014). But *Bond* did not undermine *Holland*. Instead, *Bond* looked first to statutory construction to avoid reaching the

---

expansive because "[t]he various contingencies which may form the object of treaties, are, in the nature of things, incapable of definition." 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution as Recommended by the General Convention at Philadelphia in 1787, at 363 (Jonathan Elliot ed., 2d ed. 1859). Rather, the Founders seem to have considered that politics—namely electoral accountability and impeachment—would serve as the primary check on the expansive treaty power. *See* Oona A. Hathaway *et al.*, *The Treaty Power: Its History, Scope, and Limits*, 98 Cornell L. Rev. 239, 248 (2013).

constitutional question of whether a broad reading of the Chemical Weapons Convention Implementation Act of 1998 was within Congress's treaty power. *Bond*, 572 U.S. at 856–66. The Court's primary concern was that the federal government's interpretation of that statute would create significant federalism problems because it could reach purely local crimes. *See, e.g.*, *id.* at 854, 858–60, 866. The Supreme Court, moreover, emphasized the "well-established principle governing the prudent exercise" of an Article III court's jurisdiction that it "will not decide a constitutional question if there is some other ground upon which to dispose of the case." *Id.* at 855 (quoting *Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam)). Only the concurrences suggested the prudence of addressing the reach of the treaty power. *Id.* at 873–74 (Scalia, J., concurring in judgment); *id.* at 882 (Thomas, J., concurring in judgment); *id.* at 897 (Alito, J., concurring).

Given that *Holland* remains good law, we must examine whether the PROTECT Act's criminalization of non-commercial sexual abuse by a U.S. citizen residing abroad, 18 U.S.C. § 2423(c), is rationally related to the implementation of the Optional Protocol on the Sale of Children, Child Prostitution and Child Pornography (Optional Protocol), which the United States ratified in 2002. *See* 148 Cong. Rec. S5717-01 (daily ed. June 18, 2002). "When interpreting a treaty, we 'begin with the text of the treaty and the context in which the written words are used,'" and we use our "general rules of construction." *E. Airlines, Inc. v. Floyd*, 499 U.S. 530, 535 (1991) (quoting *Vollkswagenwerk v. Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 699, 700 (1988)). The Optional Protocol requires signatories to prohibit the "[o]ffering, obtaining, or procuring or providing a child for child prostitution," which includes "the use of a child in sexual activities for remuneration or any other form of consideration." Optional Protocol art. 2(b), 3(1)(b). Signatories are further encouraged to "take such measures as may be necessary to establish its jurisdiction" over the exploitation of children for commercial gain, both when "the alleged offender is a national of that State or a person who has his habitual residence in its territory." *Id.* art. 4(2). Under international law, this common form of jurisdiction in which a country prescribes law about the "conduct, interests, status, and relations of its nationals and residents outside its territory" is termed "active personality jurisdiction" or "nationality jurisdiction." Restatement (Fourth) of the Foreign Relations Law of the United States, § 402(1)(c), cmt. g & rep. n.7 (Am. L. Inst. 2018). The underlying principle is that all nations,

including the United States, have a "personal supremacy" over their citizens residing or traveling abroad. *Blackmer*, 284 U.S. at 436, 437 n.2.

Although the Optional Protocol does not explicitly require the criminalization of non-commercial sexual abuse, there is a rational relationship between the aims of the Optional Protocol and the implementing PROTECT Act. The United States State Department explained that the revised version of § 2423(c) that criminalizes non-commercial child sexual abuse committed abroad was part of the nation's efforts to fulfill its obligations under the Optional Protocol. *See* U.S. Dep't of State, *Combined Third and Fourth Periodic Report of the United States of America on the Optional Protocols to the Convention on the Rights of the Child on the Involvement of Children in Armed Conflict and the Sale of Children, Child Prostitution, and Child Pornography*, ¶ C-57 (Jan. 22, 2016). The Optional Protocol itself states that its bare terms, such as the focus on only commercial sexual abuse, are a minimum. Optional Protocol, art. 3(1). A "holistic approach" is necessary. *See id.*; *see also United States v. Belfast*, 611 F.3d 783, 807 (11th Cir. 2010) (explaining that when a treaty sets a minimum standard, Congress may implement the treaty's aims with legislation going further than the treaty's specific text). As the D.C. Circuit explained in *Park*, the treaty's "goal of eliminating commercial child sexual exploitation, including global sex tourism, could be undercut if Congress failed to criminalize non-commercial child sex abuse by U.S. residents abroad." *Park*, 938 F.3d at 368. The Necessary and Proper Clause allows Congress to address "regulatory gaps" such as the concern about non-commercial sexual abuse of minors. *See Sabri*, 541 U.S. at 607; *United States v. Kebodeaux*, 570 U.S. 387, 395 (2013).

Without § 2423(c), a legal "loophole" exists in which individuals seeking to sexually abuse minors could escape criminally liability simply by traveling outside the United States to poor areas that are unable to prosecute such crimes domestically. *See Lindsay*, 931 F.3d at 863 ("If Americans believe that traveling to a particular foreign country includes the opportunity for unregulated, non-commercial illicit sexual conduct, they may travel to that country when they otherwise would not."). It is rational to believe that the absence of legislation criminalizing non-commercial sexual activity abroad would undercut the Optional Protocol's aim of undermining global sex tourism involving minors. As the D.C. Circuit explained, "[i]f a U.S. national could

travel overseas and entice a child with inchoate favors, valuable experiences, promised future benefits, meals, or other gifts" without facing prosecution, "deterrents against traveling internationally to sexually abuse children would be significantly weakened." *Park*, 938 F.3d at 369.

Rather than undertaking the normative analysis of whether the statute enacted by Congress is rationally related to the implementation of the Optional Protocol, the opinion again relies on a recitation of history, here pointed to proving that the Founders would not have placed in the Constitution "a hidden power to 'overleap the bounds' of all the other powers in that Article." Op. at 12. In addition to my objections regarding the limits of historical interpretation, the opinion's concerns about the dangers of Congress's treaty power overlook the constraints on that power embedded in the Constitution and our case law. As the D.C. Circuit noted in *Park*, "[t]he government may not simply point to any tangentially related treaty to defend a constitutionally suspect statute." *Park*, 938 F.3d. at 369. First, a valid exercise of the Necessary and Proper Clause requires that there be a "plain" connection between a "legitimate" treaty and the implementing statute. *McCulloch*, 17 U.S. (4 Wheat.) at 421. Second, valid implementing legislation cannot be "prohibited" by the Constitution and must be in accord "with the letter and spirit of the constitution." *Id.* The majority's disagreement with Justice Holmes's controlling opinion in *Missouri v. Holland* does not change this assessment, particularly with respect to § 2423. Though *Holland*'s recognition that the preeminent importance of foreign affairs and federal flexibility in responding to international issues still rings true, *see* 252 U.S. at 435, the Court has also clarified that "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution," *Boos v. Barry*, 485 U.S. 312, 324 (1988) (quoting *Reid v. Covert*, 354 U.S. 1, 16 (1957)).

I am troubled by the notion that anecdotal "historical" statements impart the ability to speak with confidence about how the Framers of the Constitution would have considered the particulars of a current case. Even if I put aside the very real methodological concerns about this

type of quasi-historical analysis,**5** we are still left with the unrealistic assumption that all the human factors that render "our own world so messy and confusing" were somehow absent from the time of our nation's origins. Kramer, *supra*, at 401. Humanity being what it is, I am inclined to agree that in those times, as in our own, there is "seldom complete consistency, much less consensus." *Id.* As a result, I think that our efforts to resolve such difficult decisions of first impression should entail two practical constraints: first, that we recognize the limitations of our ability to draw controlling historical conclusions; and second, that we honor judicial precedent by undertaking the traditional methods of analysis relied upon in those precedents.

At the close of the Constitutional Convention in 1787, Benjamin Franklin remarked that, although he disapproved of aspects of the Constitution, he would not be in haste to pass public judgment because "[f]or having lived long," he had "experienced many instances of being obliged by better information, or fuller consideration, to change opinions even on important subjects, which I once thought right, but found to be otherwise." 3 The Records of the Federal Convention of 1787, at 641–42. Our preeminent Founding Father explained to his colleagues, "[T]he older I grow, the more apt I am to doubt my own judgment, and pay more respect to the judgments of others." *Id.* at 642.

Our nation has had over 200 years to interpret our Constitution. Throughout those many years and cases, the justices and judges in our third branch of government have taken to heart the

---

**5**See Kramer, *supra*, at 407 ("Yet originalism still depends on a historical claim to justify its authoritativeness: the claim that what today's interpreters say is what the Founders enacted. And insofar as the originalist interpretive method unavoidably involves a creative act by the modern interpreter—that of completing an argument that may have been unfinished when the Constitution was adopted—this link is just as unavoidably broken. At that point, there is literally no difference between what an originalist does and what is done by the most anti-historicist non-originalist—except, of course, for the results (each approach producing its share of outcomes that adherents of the other approach view as bizarre, made up, and unjustifiable)."); *see also* Adrian Vermeule, *Common Good Constitutionalism* 92–99 (2022). Methodology aside, it is interesting to note that even Thomas Jefferson voiced concern about letting the legal analyses of one generation have an iron grip over all subsequent generations. *See* Letter from Thomas Jefferson to James Madison (Sept. 6, 1789), in 15 The Papers of Thomas Jefferson at 392–98 (Julian P. Boyd & William H. Gains, Jr., eds., 1958). Jefferson recognized that "original understandings are binding for a time but then they lose their force." David A. Straus, *Foreword: Does the Constitution Mean What It Says?*, 129 Harv. L. Rev. 1, 57 (2015).

admonition of Founding Father Benjamin Franklin. We have received new or better information that, on occasion, has led us to change our opinions and to pay respect to the opinions of others on what that venerable document means. I would therefore follow the process developed by the judiciary over time. When I employ here those principles found in case law handed down from the Supreme Court and the guidance from our sister circuits, I reach the same ultimate result as the opinion. In doing so, however, I follow a different path (as to process and substance) that leads me to conclude that both the treaty power and the Foreign Commerce Clause provide the constitutional support necessary for Rife's conviction under § 2423. I therefore respectfully limit my concurrence to the judgment in this case.