RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 23a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DAVID ALLEN (22-1698); MICHAEL DAVIS (22-1717),

*Defendants-Appellants*.

> Nos. 22-1698/1717

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:18-cr-20085—Paul D. Borman, District Judge.

Decided and Filed:  November 9, 2023

Before:  STRANCH, BUSH, and MURPHY, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Martin J. Beres, Clinton Township, Michigan, for Appellant in 22-1698.  Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellant in 22-1717.  William J. Vailliencourt, Jr., UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

The court delivered a PER CURIAM opinion.  MURPHY, J. (pp. 17–25), delivered a separate concurring opinion, in which BUSH, J., joined.

_____

## OPINION

_____

PER CURIAM.  Michael Davis and David Allen pleaded guilty to using a facility of interstate commerce (their cellphones) in a murder-for-hire scheme, in violation of 18 U.S.C.

§ 1958(a). But they reserved the right to raise two constitutional issues on appeal, one involving the Commerce Clause and the other involving the Sixth Amendment right to a speedy trial.

Davis and Allen first argue that the government could not constitutionally apply the federal murder-for-hire statute to their conduct. Although the statute rests on Congress's power to regulate interstate commerce, Davis and Allen never left Michigan or even made calls outside the State when committing the murder. At most, some of their intrastate calls required the telephone company to use out-of-state switches. This interstate connection, they say, does not suffice to give Congress the power to regulate their crime. Our binding precedent requires us to reject this claim. The Supreme Court has held that Congress may regulate the "instrumentalities of interstate commerce" even when used only within a State, and we have long treated an ordinary telephone as one such "instrumentality" within Congress's control. *See United States v. Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022); *United States v. Weathers*, 169 F.3d 336, 341–42 (6th Cir. 1999).

So Davis and Allen turn to their speedy-trial claims. Before they pleaded guilty, the district court had postponed their trial for nearly four years. Davis and Allen allege that this lengthy delay violated the Sixth Amendment right to a speedy trial, and Allen also claims that it violated the Speedy Trial Act. But the delay arose in part from their own repeated requests for more time and in part from the COVID-19 pandemic. Because the district court found that both reasons justified the delay, it saw no speedy-trial problem. We agree and affirm.

I

In their plea agreements, Davis and Allen admitted to the following details of their murder-for-hire scheme. Dwight Williams wanted to kill Deangelo Pippen. In late December 2016, Williams asked Davis to commit the murder in exchange for money. Davis agreed. He then convinced two acquaintances—Allen and Christopher Davis—to help carry out the murder in return for a cut of the promised payment. (We will refer to Christopher Davis by his full name to distinguish him from the appellant.)

The murder plans had taken shape by December 23. That day, Williams paid the downpayment for the murder. Davis also rented a GMC Terrain to implement the plan. Pippen

had been staying in a Muskegon apartment in western Michigan. Since Davis and the others lived in Detroit, they needed to travel across the State to commit the murder.

Davis, Allen, and Christopher Davis drove the GMC Terrain to Muskegon on December 28. But they could not find Pippen. So they stayed overnight at a hotel in Grand Rapids. The next day, they waited several hours outside Pippen's apartment. When Pippen left in his Chrysler, Allen drove the GMC Terrain in pursuit with the two Davises riding along as passengers. Allen eventually pulled next to Pippen's stopped car at a red light in nearby Norton Shores. The two Davises fired multiple shots into Pippen's car, killing him. The hitmen then returned to Detroit. Williams paid Davis, who split the proceeds with the others.

None of the accomplices traveled outside Michigan to plan or execute the murder. But they did use their cellphones to facilitate it. Williams called Davis over the phone to solicit the murder, and Davis used his phone to convince Christopher Davis to help carry it out. When the men traveled to Muskegon on December 28, they also used their phones to stay in touch with Williams, who remained back in Detroit. They called Williams both shortly before and shortly after the murder. Although these calls all occurred within Michigan, they "were routed through out-of-state switches" for their completion. Davis Plea Agreement, R.322, PageID 1745; Allen Plea Agreement, R.325, PageID 1769.

On February 7, 2018, a federal grand jury indicted all four men. The government charged them with, among other things, conspiring to use and actually using facilities of interstate commerce to commit a murder for hire, in violation of 18 U.S.C. § 1958(a). The parties took some four years to resolve the charges against Davis and Allen, the two appellants. Substantial delays occurred while Davis's and Allen's lawyers sought to convince the government not to seek the death penalty, while these lawyers sought to prepare for trial, and while the COVID-19 pandemic limited the court's ability to conduct criminal proceedings.

During this time, Davis and Allen litigated the two issues that matter now. They first sought to dismiss the murder-for-hire counts on the ground that the Commerce Clause did not give Congress the power to punish their intrastate murder. The district court disagreed. *See United States v. Davis*, 2020 WL 3402023, at *2 (E.D. Mich. June 19, 2020). It reasoned that the

defendants' cellphones were "instrumentalities of interstate commerce" and that Congress could regulate "those instrumentalities" even when used to engage only in intrastate activity. *Id.*

Davis and Allen next moved to dismiss the indictment on speedy-trial grounds. Allen invoked both the Sixth Amendment's Speedy Trial Clause and Congress's Speedy Trial Act, whereas Davis asserted only a constitutional claim. The district court also rejected these speedy-trial challenges. *See United States v. Allen*, 2021 WL 5994725, at *1–3 (E.D. Mich. Dec. 16, 2021); *United States v. Davis*, 2021 WL 5989060, at *1–3 (E.D. Mich. Dec. 16, 2021).

After these rulings, Davis and Allen conditionally pleaded guilty to the murder-for-hire counts. In return, the government dropped all other charges. It also agreed that the "appropriate" sentence for Davis was 30 years' imprisonment and that the "appropriate" sentence for Allen was 20 years' imprisonment. Davis Plea Agreement, R.322, PageID 1749; Allen Plea Agreement, R.325, PageID 1773. The district court followed these sentencing recommendations.

In their plea agreements, Davis and Allen reserved the right to appeal two issues: Did the Commerce Clause give Congress the authority to punish their murder for hire even though it took place within Michigan? And did the nearly four-year delay violate their constitutional or statutory rights to a speedy trial? Davis and Allen now raise both issues. We will address them in turn.

## II. Commerce Clause Challenge

Davis and Allen first argue that the Commerce Clause prohibited the federal government from applying the murder-for-hire statute to their intrastate conduct. We review this constitutional question de novo. *See United States v. Rife*, 33 F.4th 838, 842 (6th Cir. 2022). And we must reject their argument because it conflicts with binding circuit precedent.

Congress may exercise only those powers that the Constitution grants it, including the power "[t]o regulate Commerce . . . among the several States[.]" U.S. Const. art. I, § 8, cl. 3. The Supreme Court's modern precedent has identified "three broad categories of activity" that Congress may regulate using its power under the Commerce Clause. *United States v. Lopez*, 514 U.S. 549, 558 (1995); *see United States v. Morrison*, 529 U.S. 598, 608–09 (2000).

*First*, the Supreme Court has held that the Commerce Clause gives Congress the power to regulate the "use of the channels" through which "interstate commerce" occurs. *Lopez*, 514 U.S. at 558. Because interstate "commerce" means economic "exchange" between States, it includes the transportation of the goods that parties seek to sell. *Rife*, 33 F.4th at 842 (citation omitted). So Chief Justice Marshall recognized long ago that the Commerce Clause allowed Congress to impose "navigation" regulations in bodies of water used to ship goods interstate. *See Gibbons v. Ogden*, 22 U.S. 1, 196–97 (1824). The Court has also long held that Congress has the general power to prohibit the interstate shipment of certain goods—such as lottery tickets, *see Champion v. Ames*, 188 U.S. 321, 344, 352–54 (1903), or products made by employees who do not receive a minimum wage, *see United States v. Darby*, 312 U.S. 100, 109–10, 113–17 (1941).

*Second*, the Supreme Court has held that Congress may regulate the "instrumentalities of interstate commerce" even when a party uses these "instrumentalities" only for intrastate activities. *Lopez*, 514 U.S. at 558. So Congress may require railroads to place safety devices on their cars, including cars that might operate exclusively within one State, because of the cars' intermingled nature. *See S. Ry. Co. v. United States*, 222 U.S. 20, 26–27 (1911). Congress may also oversee the railroads' intrastate shipping rates to prevent railroads from subsidizing those intrastate trips by charging higher prices for interstate shipments. *See Houston, E. & W. Tex. Ry. Co. v. United States (Shreveport Rate Cases)*, 234 U.S. 342, 353–54 (1914). And Congress may establish rules governing interstate highways, including rules governing the disclosure of studies of those highways. *See Pierce County v. Guillen*, 537 U.S. 129, 135–36, 146–47 (2003).

*Third*, the Supreme Court has held that Congress may regulate those intrastate activities that substantially affect interstate commerce. *See Lopez*, 514 U.S. at 559. The Court thus held that Congress may prohibit a person from growing a small amount of marijuana for personal use in order to extinguish the interstate marijuana market. *See Gonzales v. Raich*, 545 U.S. 1, 15–22 (2005). And it held that Congress may prohibit a farmer from growing wheat for use on his farm in order to prop up interstate wheat prices. *See Wickard v. Filburn*, 317 U.S. 111, 128–29 (1942). But the Court has refused to extend this third category indefinitely. So it concluded that Congress could not enact a civil remedy for violence against women or a criminal ban on the

possession of guns near schools because these noneconomic activities had a tenuous connection to interstate commerce. *See Morrison*, 529 U.S. at 607–19; *Lopez*, 514 U.S. at 559–68.

How does this three-part legal taxonomy apply to the murder-for-hire crime that Davis and Allen committed? As relevant here, the murder-for-hire statute punishes anyone who "uses . . . any facility of interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a). The statute goes on to define a "facility of interstate or foreign commerce" to include "means of transportation and communication." *Id.* § 1958(b)(2).

The government applied this statute to Davis and Allen even though they did not leave Michigan to commit the murder. It relied on the undisputed fact that Davis and Allen "use[d]" their cellphones to coordinate the murder. 18 U.S.C. § 1958(a); Davis Plea Agreement, R.322, PageID 1744–45; Allen Plea Agreement, R.325, PageID 1768–69. Many courts (including our own) have held that a phone is a "facility of interstate or foreign commerce" within the meaning of the murder-for-hire statute or similar laws. 18 U.S.C. § 1958(a); *see Weathers*, 169 F.3d at 341; *see also United States v. Taplet*, 776 F.3d 875, 882 (D.C. Cir. 2015); *United States v. Evans*, 476 F.3d 1176, 1180–81 (11th Cir. 2007). And while Davis's and Allen's calls all involved parties within Michigan, many of the calls required the use of "out-of-state switches" for their connection. Davis Plea Agreement, R.322, PageID 1745; Allen Agreement, R.325, PageID 1769. We thus must decide whether the Commerce Clause allowed Congress to prohibit intrastate phone calls as part of a murder-for-hire plot—at least when the calls used interstate switches.

Relying on *Lopez* and *Morrison*, Davis and Allen argue that the Supreme Court's recent curtailment of its third ("substantial effects") category renders the murder-for-hire statute unconstitutional as applied to their intrastate conduct. This argument lacks merit because the government disclaims any reliance on the third category that *Lopez* and *Morrison* addressed. Under our precedent, their conduct instead fell within the Supreme Court's first and second categories of activity that Congress may regulate.

To begin with, we have held that a defendant uses "the channels of interstate commerce"—the channels subject to congressional regulation under the first category—when the defendant makes *intrastate* phone calls that require the use of *interstate* switches for their connection. *Lopez*, 514 U.S. at 558; *see Weathers*, 169 F.3d at 342. In *Weathers*, Jeffrey Eugene Weathers made and received phone calls to arrange a murder, so the government charged him with violating an earlier version of the murder-for-hire statute. 169 F.3d at 338. At the time, this statute more narrowly covered the use of a facility *in* interstate commerce rather than (as now) the use of a facility *of* interstate commerce. *See id.* at 340. We reasoned that telephones (including cellphones) qualify as "instrumentalities *of* interstate commerce" even when a defendant does not use them to make interstate calls. *Id.* at 341. But we held that this now-outdated statute's use of the preposition "in" meant that Congress chose to cover "interstate activities only." *Id.* (citation omitted). That said, we affirmed Weathers's conviction because his "*intra* state" calls required "*inter* state activities" to connect the parties and so involved the use of the channels of interstate commerce. *Id.* at 342.

Aside from *Weathers*, we have "repeatedly" held that telephones (including cellphones) qualify as "instrumentalities of interstate commerce" that Congress may regulate under the Court's second category even when a party does not use the phone in any interstate activities. *Windham*, 53 F.4th at 1013; *see United States v. Dais*, 559 F. App'x 438, 445 (6th Cir. 2014). Most recently, we reached this conclusion to reject a Commerce Clause challenge to the federal kidnapping statute, which punishes a person who "uses . . . any means, facility, or instrumentality of interstate or foreign commerce" to commit a kidnapping. *Windham*, 53 F.4th at 1010 (quoting 18 U.S.C. § 1201(a)(1)). The government had charged Seth Windham with using a cellphone to kidnap the victim, but no evidence suggested that he had made interstate calls or engaged in interstate activity. *Id.* at 1009, 1011. We held that this fact did not matter: Because phones are "instrumentalities of interstate commerce," Congress may even regulate their "intrastate" use. *Id.* at 1013.

Apart from our own precedent, many other circuit courts have likewise said that the Commerce Clause gives Congress the power to prohibit the use of instrumentalities of interstate commerce (such as cars or phones) in a murder-for-hire scheme. *See United States v. Francisco*,

642 F. App'x 40, 44–45 (2d Cir. 2016) (summary order) (relying on *United States v. Perez*, 414 F.3d 302, 304–05 (2d Cir. 2005) (per curiam)); *United States v. Runyon*, 707 F.3d 475, 488–89 (4th Cir. 2013); *United States v. Marek*, 238 F.3d 310, 317–20 (5th Cir. 2001) (en banc); *United States v. Mandel*, 647 F.3d 710, 716–17, 720–22 (7th Cir. 2011); *see also United States v. Gilbert*, 181 F.3d 152, 157–59 (1st Cir. 1999); *United States v. Giordano*, 442 F.3d 30, 41 (2d Cir. 2006) (Sotomayor, J.); *United States v. Morgan*, 748 F.3d 1024, 1031–32 (10th Cir. 2014).

This caselaw dooms Davis's and Allen's arguments in this case. As in *Weathers*, there is no dispute that their telephone calls required the use of out-of-state switches. So Congress could reach their conduct under its power to regulate "the use of the channels of interstate commerce[.]" *Weathers*, 169 F.3d at 342. And as in *Windham*, there is no dispute that Davis and Allen at least used cellphones to commit the murder-for-hire scheme. So Congress could prohibit their cellphone use under its power to regulate "an instrumentality of interstate commerce" even when the conduct takes place "entirely intrastate[.]" *Windham*, 53 F.4th at 1012.

## III.  Speedy Trial Challenge

Davis and Allen next argue that the four-year delay in their case violated their Sixth Amendment speedy-trial rights, and Allen adds that this delay also violated the Speedy Trial Act.

### A.  Procedural History

The merits of Davis's and Allen's speedy-trial claims must begin with a summary of the delays in their case. Under the Sixth Amendment, the speedy-trial clock begins to run from the earlier of a defendant's arrest or indictment. *See United States v. Young*, 657 F.3d 408, 414 (6th Cir. 2011). Under the Speedy Trial Act, the government has 70 days to commence trial from the later of a defendant's initial appearance or indictment. *See* 18 U.S.C. § 3161(c)(1). Here, the grand jury issued its indictment (which occurred before any arrests) on February 7, 2018. Allen made his initial appearance on February 8, and Davis made his initial appearance on March 9. Yet the district court delayed the trial for about four years, setting a final trial date of February 1, 2022, before Davis and Allen chose to plead guilty. This lengthy delay arose for four general reasons.

*Reason One*: Because Davis and Allen killed their victim, the murder-for-hire offense made them eligible for the death penalty. *See id.* § 1958(a). The government and the defendants jointly requested an extension of time so that defense counsel could develop a mitigation case against the death penalty and the government could fully consider whether to seek that penalty. Order, R.59, PageID 130–31. The court thus granted an initial extension until October 2018 and a second one until April 2019. *Id.*, PageID 135; Order, R.118, PageID 342; *see* 18 U.S.C. § 3161(h)(7)(A).

When the April 2019 deadline approached, defense counsel alerted the court that they were still completing their mitigation cases. Tr., R.156, PageID 454–55. At this hearing, however, Davis stated that he would prefer to proceed to trial even if the death penalty remained on the table. *Id.*, PageID 461–62, 464. Allen also opined, "I've been here 15 months, incarcerated 15 months and I'm ready to go to trial." *Id.*, PageID 466. The government and defense counsel countered that, while the defendants had a "voice" in this process, the "ultimate decision" about a continuance rested with the court. *Id.*, PageID 471–76. Given the death-penalty risk, the court agreed with counsel that the ends of justice outweighed the defendants' preferences. *Id.*, PageID 479. It extended the trial date to after September 2019. *Id.*, PageID 482. That August, the government opted against the death penalty.

*Reason Two*: From the outset, the parties recognized that the case would require extensive discovery and a complex trial. Order, R.59, PageID 131–32. Near the time that the government declined to seek the death penalty, it had already disclosed nearly 200,000 pages of discovery to the defense. Tr., R.367, PageID 2370–71. With their clients' agreement, therefore, defense counsel switched to seeking more time to prepare for the trial. *Id.* at PageID 2374–75. The court extended the trial date from September 2019 until May 2020. Order, R.181, PageID 619.

During this time, a conflict emerged between Davis and his counsel. The court thus appointed him new counsel. Tr., R.368, PageID 2386. His new counsel requested a delay through July 2020 to get up to speed on the case. *Id.* Although Allen refused to consent to this delay for Davis, the court nevertheless granted the extension. Order, R.207, PageID 725 n.2, 729.

*Reason Three*: This extension (which the court granted in March 2020) landed the trial date in the middle of the COVID-19 pandemic. Within a week of the court's order, the federal and state governments declared states of emergency. Order, R.247, PageID 1060–61. The District Court for the Eastern District of Michigan indefinitely postponed all trials. *Id.*, PageID 1061. Because the court could not hold a trial in July 2020 and because defense counsel could not interview witnesses, the parties obtained another continuance until October 2020. *Id.* at 1062–63, 1068. When that month came with no end to the pandemic in sight, the court granted an indefinite continuance over the objection of Allen (but not his lawyer). Order, R.263, PageID 1139.

*Reason Four*: With the availability of the COVID-19 vaccine and the rescission of Michigan's emergency orders restricting activities, the district court began to schedule trials in the second half of 2021. Order, R.277, PageID 1219. But defense counsel needed more time to prepare given the limited ability to do so during the pandemic. *Id.*, PageID 1219–21. In August 2021, the court issued a final continuance to February 1, 2022. *Id.*, PageID 1221, 1224.

A month after the court issued this last extension, Allen moved to dismiss the indictment under the Sixth Amendment and the Speedy Trial Act. Davis also later challenged the delay under the Sixth Amendment but conceded that the delay had not violated the Speedy Trial Act.

The district court rejected both motions. *Allen*, 2021 WL 5994725, at *1–3; *Davis*, 2021 WL 5989060, at *1–3. As for the constitutional claim, it held that defense counsel had caused much of the delay, the defendants had not vigorously asserted their speedy-trial rights, and the delay had not prejudiced them. *See Allen*, 2021 WL 5994725, at *2–3; *Davis*, 2021 WL 5989060, at *1–3. As for the statutory claim, it held that defense counsel had agreed that the ends of justice warranted the delay. *Allen*, 2021 WL 5994725, at *1.

## B. Sixth Amendment

The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. This speedy-trial right exists to protect presumptively innocent defendants from languishing in jail while the government doddles to prosecute them. *See Betterman v. Montana*, 578 U.S. 437, 442–43 (2016). The word

"speedy" might suggest that a trial must occur without *any* delay no matter the reason, but the Supreme Court has never interpreted the clause in a literal fashion. *See Doggett v. United States*, 505 U.S. 647, 651 (1992). It has reasoned that it cannot identify "with precision" what amount of delay will violate this "vague" speedy-trial right. *Barker v. Wingo*, 407 U.S. 514, 521, 523 (1972).

Rather than set a fixed time period, *Barker* selected a "balancing test" that decides each speedy-trial claim on an "ad hoc basis." *Id.* at 530. It identified four questions for courts to ask when confronted with such a claim: How long was the delay? What was the reason for it? Did the defendant timely assert this speedy-trial right? And what prejudice, if any, has the defendant suffered? *See id.* To resolve the claim, a court must "engage in a difficult and sensitive balancing" of these four factors along with any other "relevant" circumstance. *Id.* at 533. We have engaged in this balancing many times since *Barker*, as the following sampling of cases shows. *See, e.g.*, *Brown v. Romanowski*, 845 F.3d 703, 712–19 (6th Cir. 2017); *United States v. Sutton*, 862 F.3d 547, 558–62 (6th Cir. 2017); *Young*, 657 F.3d at 414–20; *United States v. Brown*, 498 F.3d 523, 530–32 (6th Cir. 2007); *United States v. Jackson*, 473 F.3d 660, 664–68 (6th Cir. 2007); *United States v. Schreane*, 331 F.3d 548, 553–59 (6th Cir. 2003); *United States v. Howard*, 218 F.3d 556, 563–65 (6th Cir. 2000); *Redd v. Sowders*, 809 F.2d 1266, 1269–72 (6th Cir. 1987); *Cain v. Smith*, 686 F.2d 374, 380–85 (6th Cir. 1982). When analyzing these factors, we review a district court's legal rulings de novo and its findings of fact for clear error. *Romanowski*, 845 F.3d at 712.

*Length of the Delay*. To begin with, the Supreme Court has held that a delay must be sufficiently "long" to trigger any other factor. *See United States v. Loud Hawk*, 474 U.S. 302, 314 (1986); *Romanowski*, 845 F.3d at 713–14. In other words, the "customary" delays during any litigation—such as a five-month delay—automatically pass muster under the Sixth Amendment. *Doggett*, 505 U.S. at 652; *see Romanowski*, 845 F.3d at 713. But a delay longer than a year presumptively meets this "threshold" requirement. *Jackson*, 473 F.3d at 665; *see also Brown*, 498 F.3d at 530. And the four-year holdup in this case looks more like the "extraordinary" delay that the Court confronted in *Barker* than the "customary" one that it hypothesized in *Doggett*. *Compare Barker*, 407 U.S. 53, *with Doggett*, 505 U.S. at 652.

The government thus concedes that this delay requires us to invoke the remaining factors. Appellee's Br. 42–43.

*Reason for the Delay*.  The Supreme Court has cataloged the possible reasons for a delay into three general buckets tied to the party at fault.  *See Romanowski*, 845 F.3d at 714.  In bucket one, this reason-for-delay factor weighs strongly against the government if the government engineers a delay in bad faith "to hamper the defense" or obtain a tactical advantage.  *Barker*, 407 U.S. at 531.  In bucket two, this factor still weighs against the government (but less so) if it causes the delay for an invalid reason but without any bad intent.  Examples of this second type of delay include the executive branch's "negligence" in tracking down a defendant or the judicial branch's "overcrowded" dockets.  *Doggett*, 505 U.S. at 652; *Barker*, 407 U.S. at 531.  In bucket three, this factor weighs in favor of the government if it identifies a legitimate reason for the delay or if the defendant causes it.  *Barker*, 407 U.S. at 531.  Examples of this third type of delay include the federal government's decision to wait for the state government to prosecute the defendant for the same conduct, *see Schreane*, 331 F.3d at 554–55, defense counsel's decision to litigate pretrial motions or ask for continuances, *see Young*, 657 F.3d at 415–16, or the defendant's decision to seek new counsel, *see Brown*, 498 F.3d at 531.

Under this framework, the reasons for the delay in this case undercut Davis's and Allen's speedy-trial claims.  From April 2018 to July 2020, defense counsel asked for continuances either to convince the government not to seek the death penalty or to prepare for the trial. Because these lawyers—the agents of Davis and Allen—requested the delays, this part of the delay favors the government.  *See Vermont v. Brillon*, 556 U.S. 81, 90–91 (2009); *Young*, 657 F.3d at 415–16.

Next, from July 2020 to August 2021, the district court delayed the trial because of the COVID-19 pandemic.  We and other courts have treated this type of delay as a valid reason that also weighs against the defendants (or at least as a neutral reason that favors neither party).  *See United States v. Jones*, 2023 WL 1861317, at *8 (6th Cir. Feb. 9, 2023); *see also United States v. Snyder*, 71 F.4th 555, 578 (7th Cir. 2023); *United States v. Rodriguez-Mendez*, 2023 WL 3378005, at *3 (3d Cir. May 11, 2023); *United States v. Vladimirov*, 2023 WL 2535263, at *5 (4th Cir. Mar. 16, 2023) (per curiam); *United States v. Keith*, 61 F.4th 839, 852–53 (10th Cir.

2023). That conclusion is especially fitting in this case because both the government and Davis's and Allen's lawyers jointly agreed to these pandemic-related continuances.

Lastly, from August 2021 to February 2022, defense counsel requested a final delay so that they could undertake the trial preparations that the pandemic had prevented. This delay likewise undermines Davis's and Allen's claims. *See Brillon*, 556 U.S. at 90–91. All told, this factor favors the government because the delays stem either from the defendants' conduct or from the pandemic.

In response, Davis and Allen argue that the government's negligence caused the COVID-19 delays because it did not prepare adequate means to hold a trial, and they analogize the pandemic to overcrowded dockets. This claim has legal and factual problems. Legally, we have already rejected their logic. *See Jones*, 2023 WL 1861317, at *8. Factually, they do not challenge the district court's findings about the pandemic's unexpected effects on the criminal-justice system. *See Allen*, 2021 WL 5994725, at *2. To the contrary, they admit that "real concerns" justified this part of the delay. Allen Appellant's Br. 41; Davis Appellant's Br. 37.

*Assertion of Rights*. When considering whether a defendant has adequately raised a speedy-trial objection, courts consider both how early a defendant has asserted this right and how often the defendant has done so. *See Barker*, 407 U.S. at 531–32, 534–35; *Sutton*, 862 F.3d at 561. Davis and Allen do not fare well under these benchmarks.

Start with Davis. Over a year after his indictment, he objected once to his *own* counsel's request for a five-month delay (from April to September 2019) in order to convince the government not to seek the death penalty. *Cf. United States v. Flowers*, 476 F. App'x 55, 63 (6th Cir. 2012). But Davis repeatedly consented to every other delay until he moved to dismiss the indictment years down the road. In many respects, then, Davis looks just like the defendant in *Barker*, who also did not object to repeated continuances until moving to dismiss the indictment much later. *See* 407 U.S. at 516–17, 534–35. In sum, Davis consented to all but several months of the four-year delay.

Turn to Allen. While he raised his speedy-trial rights with a little more vigor, he also agreed to most of the four-year delay. Like Davis, he objected to the delay in a "belated nature"

by waiting until over a year after the indictment when his counsel sought the same five-month delay to convince the government not to seek the death penalty. *Flowers*, 476 F. App'x at 63. But Allen then flipflopped, agreeing to the next delay so that his counsel could prepare for trial. He then switched again, objecting to Davis's request for a few more months so that his new counsel could get up to speed (from May to July 2020) and to the indefinite pandemic-related continuance (granted in October 2020). But the latter objection did not last long. In monthly status reports starting in November 2020, his counsel regularly stated that he consented to continued pandemic-related delays. And Allen did not object again until he moved to dismiss the indictment in September 2021. This stop-and-go conduct casts doubt on the "sincerity" of Allen's request for a speedy trial. *Sutton*, 862 F.3d at 561. At the least, it shows that Allen objected to all of one year of the four-year delay.

*Prejudice*. The Supreme Court has explained that prejudice from a pretrial delay can take various forms. *See Doggett*, 505 U.S. at 654. Some defendants must remain in jail and thereby suffer the continued pretrial deprivation of liberty. *See id.* Even those defendants who can post bail must suffer the continued disruption of their lives that arises when the government publicly accuses them of a crime. *See id.* And "most" problematically, according to the Court, a pretrial delay can undermine the defendant's trial defenses—say, if an alibi witness's memory starts to fade. *See id.* (quoting *Barker*, 407 U.S. at 532). For this defense-related harm, courts will sometimes *presume* prejudice if the government has strategically or negligently caused the delay. *Romanowski*, 845 F.3d at 717. If, by contrast, a defendant caused the delay or the government has a valid excuse for it, defendants must show *actual* defense-related prejudice or their speedy-trial claims "will generally fail." *United States v. Mundt*, 29 F.3d 233, 236 (6th Cir. 1994); *see United States v. Williams*, 753 F.3d 626, 634 (6th Cir. 2014); *Howard*, 218 F.3d at 564.

This framework dooms Davis and Allen. They cannot rely on any presumption of prejudice to their defense because they requested many of the delays themselves and because the government had a valid pandemic-related reason for the other continuances. So they must prove actual prejudice. But they identify no "specific" harm to their defense that the delay caused. *Howard*, 218 F.3d at 564. They instead paradoxically argue that the district court's decision to set the trial for February 2022 prejudiced them because it required that they conduct the trial

using physical restrictions like masking and social distancing. To avoid these restrictions, however, the district court would have needed to delay the trial even *longer*. Whether or not these restrictions matter under other constitutional provisions, *cf. United States v. Smith*, 2021 WL 5567267, at *3 (6th Cir. Nov. 29, 2021), they do not show speedy-trial prejudice.

To be sure, Davis and Allen suffered some prejudice from this lengthy delay because they remained in jail throughout this time. *See Barker*, 407 U.S. at 532. But *Barker* does not treat physical incarceration as the "most serious" type of prejudice. *Id.* In any event, Davis objected to only months of this incarceration and Allen objected to only a year of it. These periods come close to matching the 10 months that the defendant in *Barker* spent in jail before he was released on bond. *Id.* at 534. Yet *Barker* held that this prejudice did not suffice when balanced against the other factors. *Id.* at 534–35. This case requires the same result. Although, as in *Barker*, the delay was extraordinary, Davis and Allen agreed to most of it, did not vigorously assert their rights, and did not suffer any defense-related prejudice. So, as in *Barker*, their speedy-trial claims fail.

## C. Speedy Trial Act

This conclusion leaves Allen's claim that the delay violated the Speedy Trial Act. *See* 18 U.S.C. §§ 3161–3174. This Act allows a district court to extend the 70-day period in which it must try a defendant if the court finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). When engaging in this "ends of justice" inquiry, the district court must consider several "factors," including whether the failure to grant a delay would make the trial "impossible" or cause a "miscarriage of justice," and whether the case is "so unusual or so complex" that the parties cannot prepare within the allotted 70 days. *Id.* § 3161(h)(7)(B)(i)–(ii). Because district courts have broad discretion to grant ends-of-justice continuances, we review a court's decision under the deferential abuse-of-discretion standard. *See Williams*, 753 F.3d at 635.

The district court here found that the ends of justice required each delay that it granted. For the initial delays to July 2020, it reasoned both that a "miscarriage of justice" would occur if

it did not give defense counsel enough time to argue against the death penalty and that the case was "so complex" that counsel needed more time to prepare for trial.  Order, R.59, PageID 135; Order, R.152, PageID 435.  For the pandemic-related delays to August 2021, the court reasoned that trial would be "impossible" without a continuance or at least that the failure to grant the continuance would cause a "miscarriage of justice."  Order, R.247, PageID 1067; Order, R.263, PageID 1138–39.  For the final delay from August 2021 to February 2022, the court reasoned that the ends of justice warranted a continuance to allow Allen's counsel to engage in the trial preparation that the pandemic had foreclosed.  Order, R.277, PageID 1224.

On appeal, Allen challenges only the final continuance.  Despite the pandemic, he claims that it was "possible" to hold a trial by September 2021 (rather than February 2022) because the court had conducted other trials at this point.  Allen Appellant's Br. 43.  Allen ignores the reason for this last extension.  The court did not grant it because of the pandemic but because his counsel needed more time to prepare.  *See* 18 U.S.C. § 3161(h)(7)(B)(ii).  Indeed, Allen's own attorney asked for the extension purportedly with the "consent" of Allen himself.  *Allen*, 2021 WL 5994725, at *1.  The court did not abuse its discretion by granting the very continuance that Allen sought.

We affirm.

---

**CONCURRENCE**

---

MURPHY, Circuit Judge, concurring.  Michael Davis and David Allen got paid to commit a horrendous crime that ended a human life.  So seemingly all could agree with Congress's "policy judgment[]" to punish their contract murder.  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (opinion of Roberts, C.J.) (*NFIB*); 18 U.S.C. § 1958(a).  But courts must neutrally enforce the Constitution's text regardless of a law's merits.  And that text does not give Congress a "general right to punish murder," *Cohens v. Virginia*, 19 U.S. 264, 426 (1821); it instead gives Congress a specific right "[t]o regulate Commerce . . . among the several States," U.S. Const. art. I, § 8, cl. 3.  Yet Davis and Allen committed the murder entirely within Michigan.  So it is not obvious why any power over interstate commerce covers their conduct.  After all, the State of Michigan (not the federal government) has traditionally held the "sovereign" prerogative to punish violent crimes within its borders.  *United States v. Lopez*, 514 U.S. 549, 564 (1995).

To be sure, the Supreme Court once seemed to interpret the Commerce Clause as allowing Congress to regulate *any* intrastate activity that substantially affected interstate commerce.  *See*, *e.g.*, *Wickard v. Filburn*, 317 U.S. 111, 123–29 (1942).  More recently, however, the Court has limited this "substantial effects" test and reaffirmed that Congress lacks a general power to regulate all human activity.  *See Lopez*, 514 U.S. at 561–68.  The federal government thus conceded that Congress could not punish Davis and Allen's crime based on its "effect" on interstate commerce.

The government instead justified its prosecution of Davis and Allen on the ground that they made phone calls within Michigan to commit the murder.  As support for this theory, the government primarily relied on our precedent holding that the Commerce Clause allows Congress to regulate *any* local activity that uses a phone (even if only to make an intrastate call) because phones are "instrumentalities" of interstate commerce.  *United States v. Weathers*, 169 F.3d 336, 341–42 (6th Cir. 1999).  Alternatively, the government argued that the Commerce

Clause allowed Congress to prohibit Davis and Allen's murder because some of their intrastate calls flowed through the "channels of interstate commerce" in that the calls used out-of-state switches for their connection. *Id.* at 342. While our binding precedent requires us to agree with the government, I am skeptical of both grounds. I write to explain why I remain particularly unconvinced by our broad rule allowing Congress to regulate any activity using a phone. If correct, this holding would all but undo the Supreme Court's recent limits on its substantial-effects test.

I

At the time of the founding, the Commerce Clause's key word (commerce) "meant 'trade' or economic 'intercourse[.]'" *United States v. Rife*, 33 F.4th 838, 842 (6th Cir. 2022) (citing 1 Samuel Johnson, *A Dictionary of the English Language* 422 (6th ed. 1785)). Yet economic exchanges have always required more than a handshake or a contract. They have also required the physical transfer of goods from seller to buyer. "All America" at the time of the founding thus "understood" the word "commerce" to cover not just an interstate exchange but also the primary transportation method in which the parties implemented that exchange: "navigation." *Gibbons v. Ogden*, 22 U.S. 1, 190 (1824). As a result, the Commerce Clause originally allowed Congress to regulate both "trade" and the "transportation" of the traded products. *Rife*, 33 F.4th at 842.

Today, by comparison, the Supreme Court broadly reads the Commerce Clause to give Congress authority over many things that nobody would describe as interstate trade or the shipment of the traded goods. *See NFIB*, 567 U.S. at 549 (opinion of Roberts, C.J.). Since *Perez v. United States*, 402 U.S. 146 (1971), the Court has cataloged this broad commerce authority into "three" general "categories[.]" *Id.* at 150. First, Congress may regulate "the channels of interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16 (2005). Second, it may regulate the "instrumentalities of interstate commerce" and the "persons or things in" that commerce. *Id.* at 16–17. Third, it may regulate activities that "substantially affect interstate commerce." *Id.* at 17.

The third ("substantial effects") category has primarily driven the Supreme Court's expansion of the Commerce Clause. *Rife*, 33 F.4th at 843. The Court developed this substantial-

effects test in the 1930s to uphold federal laws designed to combat the Great Depression. *Id.* at 844. The test allows Congress to regulate local activities (such as growing wheat on a private farm for personal use) if the activities "have a substantial effect on interstate commerce" when considered in the aggregate. *Raich*, 545 U.S. at 17; *Wickard*, 317 U.S. at 128–29.

By 1990, many had opined that this test spelled the "death of our federal system." David P. Currie, *The Constitution in the Supreme Court: The Second Century, 1888–1986*, at 236 (1990); *see* Robert H. Bork, *The Tempting of America* 56–57 (1990). The Constitution "delegated" "few and defined" regulatory "powers" to the federal government and left the remaining "numerous and indefinite" powers to the States. *The Federalist* No. 45, at 289 (James Madison) (Clinton Rossiter ed., 1961). But if Congress could regulate *anything* that substantially affected national commerce, the federal government would seem to have obtained the unlimited "police power" reserved to the States. *NFIB*, 567 U.S. at 536 (opinion of Roberts, C.J.).

Yet these predictions proved wrong. In three cases, the Supreme Court has since placed concrete limits on its substantial-effects test. *See id.* at 548–58; *United States v. Morrison*, 529 U.S. 598, 608–09 (2000); *Lopez*, 514 U.S. at 558–59. In *Lopez*, the Court held that Congress may not make it a crime to possess a gun in a school. 514 U.S. at 559–67. In the process, it rejected the theory that gun crimes negatively affect learning, which, in turn, negatively affects interstate commerce. *Id.* at 563–64. This theory would permit Congress to regulate all crimes or other noneconomic activities that have an impact on the national GDP. *Id.* at 564. The Court refused to extend its "substantial effects" test to "noncommercial" activity in this way. *Id.* at 566–67.

The Court reaffirmed *Lopez* in *Morrison*, which considered a law that allowed victims who suffer gender-motivated violence to sue their abusers. 529 U.S. at 605–06. The Court clarified that all of its substantial-effects cases addressed "some sort of economic endeavor." *Id.* at 611. Yet domestic violence was "not, in any sense of the phrase, economic activity." *Id.* at 613. Instead, the States hold the power to regulate "intrastate violence" if the culprit does not direct that violence "at the instrumentalities, channels, or goods involved in interstate commerce[.]" *Id.* at 618.

Most recently in *NFIB*, the Court held that its substantial-effects test applies only to economic activity—not inactivity. That case considered the mandate requiring individuals to buy health insurance in the Patient Protection and Affordable Care Act. 567 U.S. at 530 (opinion of Roberts, C.J.). The controlling opinion held that Congress could not enact this mandate under the Commerce Clause. *Id.* at 548–61. It reasoned that Congress had never used its commerce authority to "compel" economic exchanges and that this type of affirmative power, if allowed, would "fundamentally" expand the limited scope of Congress's regulatory reach. *Id.* at 549, 555.

II

Given *Lopez*, *Morrison*, and *NFIB*, the government in this case "concede[d] that the activity regulated [by the murder-for-hire statute] does not have a substantial effect on interstate commerce." Resp., R.231, PageID 957. It nevertheless argued that Congress could punish Davis and Allen's murder because they made phone calls in Michigan to commit it. According to the government, phones are "instrumentalities of interstate commerce" under the Supreme Court's second category of activities that Congress may regulate. *Raich*, 545 U.S. at 16–17. This position is understandable. We have "repeatedly" treated phones as such instrumentalities—even when callers make local calls. *United States v. Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022); *United States v. Watson*, 852 F. App'x 164, 168 (6th Cir. 2021); *United States v. Dais*, 559 F. App'x 438, 445 (6th Cir. 2014); *Weathers*, 169 F.3d at 341–42. Under this logic, Congress may regulate *any* activity (whether the completion of a crime or the operation of a school) that uses a phone.

I am skeptical of this expansive rule. Judges Batchelder and Becker have already expressed many of my reservations in a related context. They critiqued an equally broad rule that treated cars as instrumentalities of interstate commerce (even when driven intrastate) and thus that gave Congress the right to regulate all local activities completed with cars. *See United States v. McHenry*, 97 F.3d 125, 132–34 (6th Cir. 1996) (Batchelder, J., dissenting); *United States v. Bishop*, 66 F.3d 569, 597–600 (3d Cir. 1995) (Becker, J., concurring in part and dissenting in part). Their concerns with this rule for cars apply just as much to phones. I will highlight three of the concerns here: this broad rule appears contrary to the Commerce Clause's

original meaning, the Supreme Court's caselaw does not seem to justify the rule, and our precedent adopted it with little reasoning.

Start with first principles: Would the Commerce Clause as originally understood have allowed Congress to regulate any local activity (such as Davis and Allen's crime) if a person made a local call to carry it out? Of course, phones (like cars) did not exist at the founding. But we often "must apply the legal rules" that flow from a "fixed constitutional" provision "to new technologies in an evolving world." *United States v. Miller*, 982 F.3d 412, 417 (6th Cir. 2020). The Supreme Court has told us how to do so. We should identify the legal principles that governed similar conduct and engage in "analogical reasoning" by asking whether these principles apply in the same way to the new phenomenon. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022). For example, the Fourth Amendment rules applicable to government searches of traditional mail may well extend to email. *See Miller*, 982 F.3d at 432–33. And the First Amendment rules applicable to government restrictions of street-corner speech may well extend to social-media speech. *See Packingham v. North Carolina*, 582 U.S. 98, 105–08 (2017).

This guidance directs us to the right questions here. Even if phones (and cars) did not exist at the founding, other means of communication (and transportation) did. Think of letters (and horses or carriages). *See Miller*, 982 F.3d at 417; *Bishop*, 66 F.3d at 598 n.18 (Becker, J., concurring in part and dissenting in part); *cf. Pensacola Tel. Co. v. W. Union Tel. Co.*, 96 U.S. 1, 9 (1877). And the government cites nothing to suggest that Congress had a power to regulate all activities completed through the intrastate delivery of a letter—just as it cites nothing to suggest that Congress could regulate, say, a local horse theft. *See Bishop*, 66 F.3d at 598 n.18 (Becker, J., concurring in part and dissenting in part). Indeed, if the Commerce Clause gave Congress this power over all activities done with letters, why would the Founders have felt the need separately to permit Congress "[t]o establish Post Offices and post Roads"? U.S. Const. art. I, § 8, cl. 7.

At most, some sources held that Congress could punish *any* use of its proprietary postal system for unauthorized purposes (under this postal power). *See Ex Parte Jackson*, 96 U.S. 727, 732–33 (1877). And others might be read to suggest that Congress could regulate the transport of *interstate* letters by non-postal means (under the commerce power). *See Champion v. Ames*,

188 U.S. 321, 346–64 (1903). Yet these sources fall short of justifying the broader rule that Congress may reach all activities done in part by the intrastate delivery of a letter outside the postal system. *Cf. Jackson*, 96 U.S. at 735. And if Congress historically lacked the power to regulate all activities involving letters, why should it now possess the power to regulate all activities involving phones?

Admittedly, the Supreme Court has taken us a long way from the Commerce Clause's original meaning. But I am aware of no Supreme Court decision that has extended it as far as we have. In *Lopez*, the Court described the second category of activities that Congress may regulate (the category relevant here) in this way: "Congress is empowered to regulate and protect the instrumentalities of interstate commerce . . . even though the threat may come only from intrastate activities." 514 U.S. at 558. So, for example, the Commerce Clause gives Congress the power to require railroad companies to use safety equipment on train cars traveling "on any railroad which is a highway of interstate commerce." *S. Ry. Co. v. United States*, 222 U.S. 20, 26 (1911). And because train cars traveling only intrastate on these railroads pose "dangers" to this interstate traffic, Congress may require these cars to use that safety equipment too. *Id.* at 26–27. Likewise, the Commerce Clause gives Congress the power to set the prices that railroad companies charge for interstate trips. *See Houston, E. & W. Tex. Ry. Co. v. United States* (*Shreveport Rate Cases*), 234 U.S. 342, 350–55 (1914). And because those companies might try to subsidize intrastate trips by raising their interstate prices, Congress may require the companies to treat the two types of trips equally. *See id.* In short, Congress "may prevent the common instrumentalities of interstate and intrastate commercial intercourse from being used in their intrastate operations to the injury of interstate commerce." *Id.* at 353.

It is not clear to me that these decisions justify our rule that Congress *automatically* may regulate all activities done with phones. I instead read the decisions to hold, consistent with the Necessary and Proper Clause, that Congress may regulate local conduct when "necessary or appropriate" to govern an interstate transportation system. *Id.* at 355; *see* U.S. Const., art. I, § 8, cl. 18. That is, Congress may regulate intrastate activities if "necessary to make a regulation of interstate commerce effective[.]" *Raich*, 545 U.S. at 35 (Scalia, J., concurring in the judgment). Here, then, perhaps Congress could protect an interstate-communications network by preventing

local activities (whether phone calls or other behavior) that harm the network. *See Pensacola Tel.*, 96 U.S. at 9–11. But the government has not argued that Davis and Allen's murder (or calls) harmed an interstate network. *Cf. United States v. Reed*, 489 F.2d 917, 920 (6th Cir. 1974). It instead argued that the mere making of a local call allowed Congress to ban a local murder—without any nexus between that local ban and a broader scheme regulating interstate commerce.

If anything, the government's broad reading would eviscerate the Supreme Court's more recent limits on its substantial-effects test. How many activities these days do not use phones (or cars)? Consider two examples. The Court's precedent makes clear that the Commerce Clause does not give Congress the power to punish the possession of a gun in a school. *See Lopez*, 514 U.S. at 559–68. But can it punish the possession of a gun in a school if the student possesses a phone? Or can it set the "curriculum" of all schools that use phones in their operations? *Id.* at 565. Likewise, the Commerce Clause does not give Congress the authority to punish gender-motivated violence in a State. *See Morrison*, 529 U.S. at 613–18. But can it punish that intrastate violence by any abuser who owns a phone or at least uses the phone to call the victim once?

I might be less skeptical of our caselaw if it had addressed my concerns about whether the Constitution's original meaning or the Supreme Court's existing precedent supported our broad rule. But our caselaw lacks this reasoning. Most of our opinions date the rule back to our 1999 decision in *Weathers*. *See, e.g.*, *Windham*, 53 F.4th at 1013. Yet *Weathers* has just a few paragraphs on this issue. 169 F.3d at 341–42. We called it "well established" that phones are "instrumentalities *of* interstate commerce," and we suggested that Congress may regulate conduct that uses phones even for "intrastate" calls. *Id.* As support, we cited two of our cases and two out-of-circuit cases. *See id.* (citing *United States v. Graham*, 856 F.2d 756 (6th Cir. 1988); *Aquionics Acceptance Corp. v. Kollar*, 503 F.2d 1225, 1228 (6th Cir. 1974); *FTC v. Shaffner*, 626 F.2d 32, 37 (7th Cir. 1980); *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997)).

But our prior cases did not establish (or even suggest) our broad rule. *Graham* considered only whether certain *interstate* phone calls satisfied a federal statute's elements, not

any constitutional question. *See* 856 F.2d at 760–61. *Aquionics Acceptance* also asked only a statutory question: Did Congress's use of the phrase "instrumentality of interstate commerce" in the Securities and Exchange Act of 1934 cover securities fraud undertaken through intrastate phone calls? 503 F.2d at 1226–28 (quoting 15 U.S.C. § 78j(b) (1970)). We read the Act to reach this fraudulent conduct and explained that this broader reading posed no constitutional problem. *Id.* at 1228. Why? Our constitutional analysis did *not* rest on the idea that the Commerce Clause gives Congress plenary power over all activities using phones. *Id.* Rather, we relied on the Supreme Court's substantial-effects test, reasoning that Congress may regulate even intrastate securities sales that have an "appreciable effect on interstate commerce." *Id.* But again, the government here disavowed any reliance on this substantial-effects test in its prosecution of Davis and Allen.

The out-of-circuit precedent also did not justify our rule. Like *Aquionics Acceptance*, the Seventh Circuit in *Shaffner* invoked the substantial-effects test. 626 F.3d at 37. Although it opined that a debt collector's phone was "an instrumentality of interstate commerce," it added that Congress could regulate the collector's "intrastate" business as long as it "directly affect[ed] interstate commerce." *Id.* The Ninth Circuit in *Clayton*, by comparison, concerned a federal law that banned the possession of "cloned" cellphones and cloning equipment. 108 F.3d at 1116–17. The court held that the prosecution did not need to show any effect on interstate commerce to prove a violation of this law because "[t]elephones are instrumentalities of interstate commerce." *Id.* at 1117 (citing *Pavlak v. Church*, 727 F.2d 1425, 1427 (9th Cir. 1984)). But this statute regulated communications equipment *itself*, so one could justify this rule on the Supreme Court's necessary-and-proper logic from cases like *Shreveport*: a defendant might use the cloned phone "to the injury of interstate commerce." 234 U.S. at 353. Indeed, *Clayton* relied on its earlier decision in *Pavlak*, which in turn rested on *Weiss v. United States*, 308 U.S. 321 (1939). *Pavlak*, 727 F.2d at 1427. *Weiss* suggested in dicta that the Federal Communications Act of 1934 could constitutionally bar the wiretapping even of intrastate phone calls because "Congress has power, when necessary for the protection of interstate commerce, to regulate intrastate transactions[.]" 308 U.S. at 327 & n.7 (citing *Shreveport*, 234 U.S. at 351–52). But again, the government has not tied its prosecution here to any broader scheme regulating interstate communications.

In short, our main decision holding that the Commerce Clause gives Congress the power to regulate all activities completed through a local phone call did not discuss the clause's original meaning. It also did not seek to reconcile its rule with the Supreme Court's most relevant precedent. It instead relied solely on circuit cases. And it may well have overread those cases.

\* \* \*

The Founders established a federalist system to protect the liberty of the local communities in each State to choose the policies that would govern their local conduct. *See Bond v. United States*, 564 U.S. 211, 220–22 (2011). This case demonstrates the point. The Michigan legislature and Congress both surely agree that Davis and Allen's murder has no place in our society. But what about the punishment? Many citizens have moral concerns with the death penalty. Michigan, for example, forbids this penalty in its constitution. Mich. Const. art. IV, § 46. But the federal murder-for-hire statute authorized a federal court to impose the death penalty for Davis and Allen's Michigan crime. 18 U.S.C. § 1958(a). And Davis and Allen spent years trying to convince federal prosecutors not to pursue that punishment. In the end, then, our broad view allowing Congress to regulate any activity done with a phone undercuts not just the Supreme Court's limits on its substantial-effects test but also the Michigan citizenry's right to govern themselves.